[90]    *ALEXANDER G. ABELL, Respondent, *v.* DAVID CALDERWOOD and ARCHIBALD JACKSON, Appellants.

[1]Statute of Fraud—Contract Void.—An unwritten contract for the sale or land is void by express declaration of the Statute of Frauds, and a court of equity has no power to enforce a specific performance of it.

Appeal from the Fourth Judicial District.

The complaint states that, on the 24th of September, 1851, the plaintiff conveyed to the defendant Jackson, a lot of ground, being a portion of the 50-vara lot known on the official map of the City of San Francisco as lot No. 126; that on the repayment of the purchase money and fifty dollars additional, Jackson agreed to re-convey the premises to plaintiff; that the defendant Calderwood, with a knowledge of the facts and rights of the plaintiff, and fraudulently conspiring with Jackson, had procured from Jackson a deed of conveyance to himself of the premises, on or about the 28th of September, 1852, for the nominal sum of twenty dollars, and had immediately recorded his deed in the office of the County Recorder.

The complaint prayed for a conveyance of the premises from the defendants to the plaintiff, and one thousand dollars damages, and costs.

The defendant Jackson made default in answering. The defendant Calderwood answered denying fraudulent intent or collusion with Jackson, and alleged that he and one Hawlin had paid plaintiff $500 for a deed of conveyance of plaintiff's alleged title to the premises; and that the defendant Jackson having shown him (Calderwood) an absolute deed to the conveyance of the premises to Jackson from the plaintiff, and Jackson and plaintiff having committed trespass upon the premises and having been sued therefor, Jackson had proposed to Calderwood to make him a con-

[1] Cited in *Lee* v. *Evans,* 8 Cal. 433; *Halleck* v. *Guy,* 9 Cal. 196; *dictum,* disapproved in *Arguello* v. *Edinger,* 10 Cal. 158.

veyance of the premises in consideration of Calderwood withdrawing his suit, to which Calderwood consented, and also paid an additional sum of money to Jackson for the deed executed to Calderwood for the premises; he also denied any possession of the premises by the plaintiff, * except a forcible one for a few hours in the month [91] of September, 1851, and denied any knowledge of the consideration paid by Jackson to plaintiff or its repayment to Jackson; and alleged that before payment of the money by him to Jackson, and the abatement of his suit against Jackson and plaintiff, he had searched at the office of the County Recorder, and had found that Jackson had an absolute deed of the premises, and had made no transfer afterwards, whereupon the defendant in good faith bought the premises from Jackson.

Upon the verdict rendered on the issue joined between the plaintiff and Calderwood, the Court decreed that the deed from Jackson to Calderwood was void, and that the defendants should convey to the plaintiff all the title to the premises, which was conveyed by the deed from the plaintiff to Jackson, and the deed from Jackson to Calderwood. The defendant, Calderwood, appealed.

*James B. Townsend*, for Appellant

*H. S. Love*, for Respondents.

Mr. J. HEYDENFELDT delivered the opinion of the Court. Mr. Ch. J. Murray concurred.

This was a bill filed to enforce the specific performance of an alleged verbal agreement for the conveyance of land. The agreement being void by the Statute of Frauds, courts of equity heretofore, have notwithstanding the Statute, granted the relief sought in certain cases where the refusal of it might enable one party to commit a fraud upon the other. In their abhorrence of fraud, these Courts have, in a material degree, abrogated the letter and spirit and intention of the written law. In the effort to escape from one

evil, they have unavoidably fallen into another, and for many years past, the best judicial minds of common law countries have conceded that the one they have fallen into is the greater evil of the two. To exemplify this position, I will quote at some length from the authorities. Judge Story says:

"It must be admitted that the exceptions thus allowed do greatly trench upon the objects and policy of the Statute of Frauds; and perhaps there might have been as [92] much wisdom *originally in leaving the Statute to its full operation, without any attempt to create exceptions, even in cases where the Statute would enable the party to protect himself from a performance of his contract through a meditated fraud. For, even admitting that such cases might occur, they would become more and more rare as the Statute became better understood; and a partial evil ought not to be permitted to control a general convenience. And indeed it is far from being certain, that these very exceptions do not assist parties in fraudulent contrivances, and increase the temptations to perjury, quite as often as they do assist them in the promotion of good faith, and the furtherance of justice. These exceptions have also led to great embarrassments in the actual administration of equity; and although in some cases, one may clearly see that no great mischiefs can occur from enforcing them, yet in others difficulties may be stated in their practical application, which compel us to pause, and to question their original propriety." (2 Story on Eq. § 765.)

In *Lindsay* v. *Lynch*, 2 Sch. and Lefr. 1, we have the opinion of Lord Redesdale. This opinion is quoted by Judge Story, in the text of his work above cited, with approbation, and its sentiments cannot fail to command my concurrence. Lord Redesdale says: "The Statute was made for the purpose of preventing perjuries and frauds; and nothing can be more manifest to any person, who has been in the habit of practicing in courts of equity, than that the relaxation of that Statute has been a ground of

much perjury, and much fraud. If the Statute had been rigorously observed, the result would probably have been, that few instances of parol agreements would have occurred. Agreements would, from the necessity of the case, have been reduced to writing. Whereas it is manifest that the decisions on the subject have opened a new door to fraud; and that under pretence of part execution, if possession is had in any way whatsoever, means are frequently found to put a court of equity in such a situation, that without departing from its rules, it feels itself obliged to break through the Statute. And I remember it was mentioned in one case in argument, as a common expression at the Bar, that it had be- * come a practice to improve gentlemen out [93] of their estates. It is therefore absolutely necessary for courts of equity to make a stand, and not carry the decisions farther."

Many other sound authorities might be cited to the same effect; and from all of them it appears, that soon after the enactment of the Statute of Frauds and Perjuries, the Courts undertook, in furtherance of their power to relieve against fraud, not merely to construe the Statute, which they had the most perfect right to do, but also to modify its application, and to overrule its most specific provisions. That this system originated in the purest and best motives, no one at this day will question, while, at the same time, it is equally beyond dispute that it constitutes a mere naked judicial usurpation. It is also very clear, that time and experience in the application of the rule referred to, has forced the conviction that the Legislature was right and the Bench was wrong; and now it is evident that for years past the Judges would have returned to obedience to the enactment, were it not that they felt bound by the numerous decisions they had made. Here in this State we labor under no such compulsion. Our State is young, our judicial system has been less than four years in existence, and but one case involving the question under consideration has been decided so as to enforce a parol agreement. In the case of *Tohler* v. *Folsom*, 1 Cal. 210, the Court decreed a specific performance, but the contract was made before the existence

of our State Government, and before the enactment of our Statute of Frauds. It is therefore in no sense an authority upon the construction, or upon the effect of the statute. We therefore feel satisfied, that in this case we are at full liberty to take a new departure; and that we ought to profit by the experience of the past, and to maintain with strictness the spirit and letter of the written law.

This is to my mind a plain duty which we cannot and ought not to escape. We are untrammelled by precedents, and no decision has been made adverse to this, which can afford the excuse that it has operated as a rule of property in a single instance.

Nor. do we conceive that our conclusion is in the least degree weakened by the 10th section of the Act. [94] That section pro- *vides: "Nothing contained in this chapter shall be construed to abridge the powers of the Courts to compel the specific performance of agreements," etc.

According to legitimate rules of construction, while it takes away nothing from the power of the Courts, it does not affirmatively confer any additional power, and as this opinion indicates, we have already determined that the Courts had no such power legitimately, and in exercising it, were guilty of a naked and inexcusable usurpation. It may be said that the 10th section must operate as a legislative recognition of the power of the Courts over this subject. This may be readily admitted, and yet would be unavailing. A recognition which is merely negative in its character, must be totally inoperative to give a specific power, especially where the exercise of such power directly, requires the obrogation of an express and affirmative provision of the law.

We therefore decide that an unwritten contract for the sale of land is void by the express declaration of the Statute of Frauds, and a court of equity has no power to enforce a specific performance of it.

The decree of the District Court is reversed.