## A. F. TURNER et al. vs. ALVAREY FISH.

Some time previous to the year 1830, S., who was a white man, intermarried with E., who was an Indian of the " Choctaw nation ; " and the parties, after their marriage, continued to reside in said nation on certain land guarantied by the 19th article of the treaty of Dancing Rabbit Creek, concluded in 1830, which provides, that each head of a family who had cultivated thirty acres of land during the year 1830, should have three quarter sections of land, to include improvements, &c. S. located the land in the name of himself and wife, and in 1835 he sold the land to H., from whom A. F., the appellee, derives his title. *Held*, that the treaty has reference to the heads of families living under the dominion of the Choctaw nation ; but it does not say that a white man may not, according to the usages and customs of that nation, be the head of a family.

Turner et al. *v.* Fish.

Where a white man married a woman who was a member of the "Indian nation," and adopted her domicil; whether he became the head of a family or not, must depend upon the law and custom regulating the marital rights of the parties in such a case; and "head of a family," mentioned in the treaty, is presumed to mean one who is so in the Choctaw sense of the term, or according to the usages and customs of that nation. *Held,* that these usages and customs, so far as the courts of the State are concerned, must be regarded as facts which must be averred and proven, like any other material fact connected with the subject of litigation; and the court can only take judicial notice of the law, or the acts of certain officers of the government, but cannot take judicial notice of local customs.

The general government having recognized the location of the land by S., and the sale by him to H., in the absence of any showing to the contrary, the validity of the action of the government will be presumed, whose duty it was to carry out the stipulations of the treaty.

On appeal from the northern district chancery court at Carrollton; Hon. Henry Dickinson, vice-chancellor.

The material facts of the case are contained in the opinion of the court.

*Sharkey* and *Withers,* for appellants.

Who was entitled to the reservation under the treaty, Smith, the white man, or his wife, the Choctaw Indian?

In order to arrive at a correct conclusion on this point, we must look to the intention of the contracting parties, for the intention of the parties must govern in the construction of any treaty, and especially of this treaty. · 4 How. 559. What was their intention in making these reservations? Indubitably, to provide a permanent home for the Choctaw Indians who chose to remain. Ib. 560. The language of this article, in explaining the reason for the reservations that follow, is,—"And that others, not provided for, may be provided for, there is reserved," &c. The term "others," in this connection, certainly means "others" of the Choctaws. By no sound principle of construction, can it be extended to include white men who may have intermarried with Indian women. The peculiar circumstances of the parties, and the whole tenor of the treaty, irresistibly lead us to the conclusion that the reservations in the 14th and

17th articles were intended to be primarily, if not exclusively, for the benefit of the Indians.

Bearing in mind that the intention of the parties is the "pole star" which is to guide us in construing this treaty, let us proceed to notice the 2d section of the 17th article. By it there is reserved "to each head of a family" who, during the year 1830, shall have cultivated thirty acres, three quarter sections of land. What is meant by the term "head of a family?" The language is general; and unless some restriction is placed upon it, each white, black, or Indian head of any white, black, or Indian family residing within the nation, and having in cultivation thirty acres, would be entitled to three quarter sections. It is evident that the term must be restricted. The whole treaty was inartificially, if not carelessly drawn. 4 How. 561. We are, therefore, under the greater necessity of looking to the intention of the parties, and making free use of one part to aid in construing another. The term "head of a family" is used in the 14th article, and is there qualified by the adjective "Choctaw." This is just the qualification we would naturally expect. The only articles of the treaty in which the phrase "head of a family" is used, are the 14th and 19th; and as it is qualified by "Choctaw" in the 14th article, we may fairly infer that it was the intention of the parties that it should be subject to the same qualification in the 19th article. As it is absolutely necessary that the phrase "head of a family" should be restricted in its meaning, it seems most natural that it should be subject to the same restriction that is placed upon the identical phrase in a preceding article. This view is strengthened when we reflect on the entire consonance of this qualification with the evident intention of the parties, as manifested throughout the whole body of the treaty.

If we are correct in our construction of the treaty, it follows that Smith had no right to alien the land without the consent of his wife; and after her death, he had at most a life interest in the land as tenant by curtesy, and his deed could pass no greater or other interest to his vendee.

The congress of the United States have placed the same

construction on this article of the treaty that we are contending for. By the act of August, 1842, section 9, it is enacted, " That nothing in this act contained shall be so construed as to authorize the said commissioners, (who were appointed to provide for the satisfaction of claims arising under the 14th and 19th articles of said treaty,) to adjudicate any claim which may be presented by a white man who may have had, or now has, an Indian wife or family; and any patent to land which shall issue on any Indian claim, under the provisions of the treaty aforesaid, shall be issued to the Indian to whom the claim was allowed, if living, and if dead, to his or her heirs and legal representatives, any act of congress or usage or custom to the contrary notwithstanding." 5 U. S. Stat. at Large, p. 516.

The patent to the Halls is dated the 16th of June, 1849, and was issued in violation of this act of congress; and having been thus issued, is null and void. *Stoddart et al.* v. *Chambers,* 2 Howard's U. S. R. 284. The heirs of said Eliza Smith were the only persons who had a right to demand and receive a patent for the land, and their rights could not be prejudiced by the action of any officer of the United States.

The statute of limitations cannot avail the defendant, for if we are correct in our construction of the treaty, Smith had a right to alien his life-estate (being tenant by the curtesy), and the statute would only commence running at his death. But at that time one of the appellants was a *feme covert,* and the other was, and still is, an infant.

We would particularly call the attention of the court to the fact that it is charged in the bill, that Smith located the land for "himself and wife," and that is not denied by the answer, and it is registered and claimed as such.

No counsel for appellee.

Mr. Justice FISHER delivered the opinion of the court.

This is an appeal from a final decree of the vice-chancery court at Carrollton, dismissing the complainants' bill.

The complainants claim the land in controversy, as heirs at

law of Freeman J. Smith, and Eliza Smith, his wife; both of whom are alleged to be dead, — the latter having died in 1836, and the former in 1842.

It is alleged that some time previous to the year 1830, Smith, who was a white man, intermarried with the said Eliza, who was an Indian woman of the Choctaw nation. That the parties, after the marriage, continued to reside in said nation, on the land named in the bill. That they cultivated the number of acres of said land required by the 19th article of the treaty of Dancing Rabbit Creek, concluded in 1830, entitling them to a reservation under the article of said treaty. That Smith located the land in the name of himself and wife. This allegation is, however, denied by the answer, and is not sustained by any proof introduced on behalf of the complainants. But on the contrary, it is alleged, that the location was made by the husband.

It is further shown that Smith, some time about 1835, sold the land to S. C. and A. C. Hall, from whom the defendant Fish derives his title. The bill further alleges that the sale by Smith to the Halls was not approved by the president, as required by the provisions of the treaty. This allegation is denied, and the president's approval of the sale, shown by the recitals of the patent, which was issued by the government, in 1849, to the Halls, conveying to them the title to the land.

The 19th article of the treaty referred to, provides that each head of a family, who had cultivated thirty acres of land during the year 1830, should have three quarter sections of land, to include his improvements, &c. It is insisted that this provision has reference to members of the Choctaw nation, who may be heads of families, and that Smith, being a white man, the location, whether made in the name of the wife or not, was in fact made for her benefit, as she was regarded by the treaty as the head of the family. It is, therefore, argued that the sale of the land by Smith, the husband, was void, and that the complainants are entitled to recover as the heirs of the wife. The controversy, it will be seen, from this statement, and the positions assumed by counsel, is narrowed down to the single question,

Turner et al. *v.* Fish.

whether the husband or the wife must be regarded as the head of the family, and entitled to the land located under the provisions of the treaty.

The argument of counsel, that in the construction of the treaty, the court must endeavor to ascertain the intention of the parties thereto, may be admitted to the fullest extent. But it is not seen how it can apply to the present case, as there is not the least intimation in any part of the treaty, who shall be considered the head of a family, or what acts shall be regarded as evidence of his occupying that relation. It is unquestionably true, that the treaty has reference to the head of a family living under the dominion of the Choctaw nation; but the treaty does not say, that a white man may not, according to the usages and customs of that nation, be the head of a family. When a white man married a woman who was a member of the Indian nation, and adopted her domicil, whether he became the head of the family or not, must depend upon the law or custom regulating the marital rights of the parties in such a case. And this is what we presume the treaty means, when it speaks of "the head of a family;" one who is so in the Choctaw sense of the term, or according to the usages and customs of that nation. These usages and customs, so far as the courts of the State are concerned, must be regarded as facts, and must be averred and proved like any other material facts connected with the subject of litigation. The court can only take judicial notice of the law, or the acts of certain officers of the government. It can take no judicial notice of local customs. The record is silent on this subject, and we must, therefore, in the absence of a showing to the contrary, presume in favor of the validity of the action of the government, whose province it was to carry out the stipulations of the treaty. It has already been stated that the government had recognized the location made by Smith, and his sale to the Halls.

Decree affirmed.