## Case No. 8,840.

### McKAY v. CAMPBELL.

[2 Sawy. 118;[1] 5 Am. Law T. Rep. U. S. Cts. 407.]

District Court, D. Oregon. Nov. 7, 1871.

CITIZENSHIP — COMMON LAW — PERSONS BORN IN OREGON, BETWEEN 1818 AND 1846 — INDIAN TRIBES INDEPENDENT COMMUNITIES — XIV AMENDMENT—ISSUE OF A BRITISH SUBJECT AND CHINOOK WOMAN.

1. By the common law a child born within the allegiance of the United States, is born a subject thereof, without reference to the political status or condition of its parents.

[Cited in Ex parte Chin King, 35 Fed. 355.]
[Cited in New Hartford v. Town of Canaan, 54 Conn. 41, 5 Atl. 362.]

2. By article 3 of the convention of October 20, 1818 (8 Stat. 249), between the United States and Great Britain, it was agreed that the Oregon territory should "be free and open to the vessels, citizens and subjects of the two powers;" which convention was continued in force until the convention of June 15, 1846 (9 Stat. 869); Held, that during the period of such joint occupation, the country, as to British subjects therein, was British soil, and subject to the jurisdiction of the king of Great Britain, but as to citizens of the United States, it was American soil and subject to the jurisdiction of the United States; and that a child born in such territory in 1823 of British subjects, was born in the allegiance of the king of Great Britain, and not that of the United States.

[Cited in Town v. De Haven, Case No. 14,113.]
[Cited in State v. Boyd, 31 Neb. 725, 48 N. W. 739, and 51 N. W. 602.]

3. The Indian tribes within the territory of the United States are independent political communities, and a child of a member thereof, though born within the limits of the United States, is not a citizen thereof, because not born subject to its jurisdiction.

[Cited in U. S. v. Osborn, 2 Fed. 60; Elk v. Wilkins, 112 U. S. 109, 5 Sup. Ct. 49.]

4. The fourteenth article of the constitution of the United States, commonly called the fourteenth amendment, is only declaratory of the common law rule on the subject of citizenship by birth, and therefore does not include Indians or others not born subject to the jurisdiction of the United States.

5. In 1823, and prior thereto, the Chinook Indians were an independent political community, inhabiting the Oregon territory, at and near the mouth of the Columbia river; and in said year the plaintiff was born at Fort George (now Astoria) of a father who was an alien and a British subject, and a mother who was a Chinook Indian; Held, that the plaintiff is either to be deemed to follow the condition of his father, and considered a British subject, or that of his mother, and considered a Chinook Indian, but that in either case he was not born a citizen of the United States.

6. At an election held on June 6, 1870, at East Dalles precinct under the laws of Oregon, the plaintiff offered to vote, and his right to do so being challenged, offered to take the prescribed oath as to his qualifications as an elector, but the defendant then being one of the judges of election at said polls, refused to administer said oath to the plaintiff, as he was required to do by the law of the state, on the ground that plaintiff was not a citizen of the United States, but a half breed Indian; Held, that whether such refusal was wrongful or not, under the state law, the plaintiff not being a citizen of the United States,

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

is not within the purview or protection of article 15 of the constitution of the United States, or the act of congress, entitled "An act to enforce the rights of citizens of the United States, to vote in the several states of the Union, and for other purposes" (16 Stat. 740), and therefore cannot maintain an action against the defendant on account of such refusal, to recover the penalty given by section 2 of said act of congress.

[This was an action by William C. McKay against James A. Campbell.

[For prior proceedings see Case No. 8,839.]

Joseph G. Wilson, for plaintiff.

James K. Kelly and Orlando Humason, for defendant.

DEADY, District Judge. This action is brought to recover a penalty of $500, given by section 2 of an act of congress entitled "An act to enforce the rights of citizens of the United States to vote in the several states of the Union, and for other purposes," approved May 13, 1870 (16 Stat. 140). It was commenced July 1, 1870, and on September 26 the court gave judgment on a demurrer to the complaint that it was insufficient—because it did not allege that the defendant refused or omitted "to swear the plaintiff as to his qualifications as an elector, on account of his race, color, or previous condition of servitude." The court at the same time ruled that under the election law of the state of Oregon, when a person who is a citizen of the United States offers to vote at any poll therein, and his right to do so is challenged, it becomes the duty of the judges of election at such poll to tender such person the prescribed oath as to his qualification as an elector, the taking of which, after such challenge, is a necessary prerequisite to his right to vote; and that if any judge of election willfully omits or refuses to furnish such person an opportunity to take such an oath, and thereby qualify himself to vote at such poll, on account of race, color, or previous condition of servitude, then he is liable to such person for the penalty prescribed by section 2 of such act of congress. McKay v. Campbell [Case No. 8,-839].

On October 29, the plaintiff, upon leave obtained, filed an amended complaint, alleging that the defendant, as judge of a certain election therein mentioned, willfully refused to permit the plaintiff to become qualified to vote thereat, on account of his being an Indian. The defendant by his answer, filed December 7, 1870, alleged that the plaintiff was an alien and not a citizen of the United States, and therefore defendant refused as alleged in the complaint, and not otherwise. To this answer the plaintiff filed a replication, the allegations of which are not material to state.

On February 4, 1871, the parties filed the following statement of facts in the case, which they then and there stipulated in writing should "be taken and considered as the special verdict of a jury therein;" and also that "if the court is of opinion that the law

arising thereon is with the plaintiff, then judgment shall be given for him for the penalty for which the action is brought;" but "if the court is of opinion that the law arising thereon is with the defendant, then judgment shall be given for him in bar of the action, and for his costs and disbursements."

"Alexander McKay, the plaintiff's paternal grandfather, was born in Scotland, and emigrated to Canada, where he married Margaret Bruce, a woman having one fourth Indian blood. The issue of this marriage was Thos. McKay, the plaintiff's father, who was born in Canada. About the latter part of the year 1810, Alexander McKay joined the expedition of John Jacob Astor, as a partner of the American Fur Company [2] and sailed from New York in the ship Tonquin, for the mouth of the Columbia river, taking with him his wife and son Thomas, the latter being then about thirteen years of age. They arrived at the mouth of the Columbia in 1811, and soon afterwards Alexander McKay perished by the destruction of the Tonquin. Thomas McKay afterwards entered into the service of the Northwest Fur Company, a corporation organized under the laws of Great Britain, having its principal office in Montreal. The trading post of Astor at Astoria was transferred to this Northwest Fur Company on the eleventh day of October, 1813, and afterwards called Fort George. In 1821, by an act of parliament, the Northwest and Hudson Bay Company were united under the name of the Honorable Hudson Bay Company, and as such held possession and control of Fort George as a trading post from that time until the treaty between the United States and Great Britain in 1846. Thomas McKay married a Chinook Indian woman, and the plaintiff was the issue of that marriage, born at Fort George (now Astoria), in 1823, while his father, Thomas McKay, was in the service of the Hudson Bay Company, and is seven sixteenths white and nine sixteenths Indian blood. Thomas McKay continued in the service of that company until about the year 1835; and his son, the plaintiff, was also in its service subsequent to the treaty between the United States and Great Britain, in 1846. The plaintiff has always lived in Oregon except from 1838 to 1843, while in the state of New York to obtain an education.

"Neither the plaintiff nor his father, nor his grandfather McKay, were ever naturalized under the laws of the United States. The plaintiff resided in Wasco county, Oregon, and in East Dalles precinct in said county, for five years prior to the election on June 6th, 1870. On that day, at a general election, the plaintiff offered to vote at the place of holding elections in East Dalles precinct, where the defendants James A. Campbell, T.

M. Ward and George Corum were the judges of election. His right to vote was challenged by one of the judges, when the plaintiff offered to take the oath required by law, as to his qualifications to vote. The judges, or one of them, stated to plaintiff as a reason for not allowing him to vote, that he was not a citizen of the United States, but was a half-breed Indian, and refused to administer the oath to him as to his qualifications, and did not permit him to vote at that election."

Upon this state of facts, counsel maintains that the plaintiff was born in the allegiance of the United States, because he was born in its territory, and is, therefore, a citizen thereof, and was entitled to vote at such election. If the premises are admitted, the conclusion follows. The rule of the common law upon this subject is plain and well settled, both in England and America. Except in the case of children of ambassadors, who are in theory born upon the soil of the sovereign whom the parent represents, a child born in the allegiance of the king, is born his subject, without reference to the political status or condition of its parents. Birth and allegiance go together. 1 Bl. Comm. 366; 2 Kent. Comm. 39, 42; Ingles v. The Sailor's Snug Harbor, 3 Pet. [28 U. S.] 120; U. S. v. Rhodes [Case No. 16,151]; Lynch v. Clarke, 1 Sandf. Ch. 630, and authorities there cited.

Counsel for defendant, while admitting the major premise of plaintiff's proposition, that any person born in the allegiance of the United States, is born a citizen thereof, disputes the minor one, that the plaintiff was so born, and insists that he was born in the allegiance of the crown of Great Britain; because the British subjects in Oregon at the date of the plaintiff's birth, must be presumed to have occupied or dwelt in the country in pursuance of the treaty of joint occupation of June 15, 1846, and therefore as British subjects. Defendant's proposition concerning the allegiance in which plaintiff was born, is based upon article 3 of the convention of October 20, 1818, between the United States and Great Britain, which reads as follows:

"Art. 3. It is agreed that any country that may be claimed by either party on the northwest coast of America, westward of the Stony mountains, shall together with its harbors, bays and creeks, and the navigation of all rivers within the same, be free and open, for the term of ten years from the date of the signature of the present convention, to the vessels, citizens and subjects of the two powers, it being well understood that this agreement is not to be construed to the prejudice of any claim which either of the two high contracting parties may have to any part of the said country, nor shall it be taken to affect the claims of any other power or state to any part of the said country; the only object of the high contracting parties in that respect being to prevent disputes and differences amongst themselves." 8 Stat. 249.

By the convention of August 6, 1827, be-

---

[2] The true name of this company was the Pacific Fur Company.

tween the same parties, it was provided as follows:

"Art. 1. All the provisions of the third article of the convention concluded between the United States of America and his majesty the king of the United Kingdoms of Great Britain and Ireland on the twentieth of October, 1818, shall be, and they are, hereby further indefinitely extended and continued in force, in the same manner as if all the provisions of the said article were herein specifically recited." 8 Stat. 360.

By article 2 of this convention it is also agreed that either party to it may abrogate said article 3, on twelve months notice to the other after October 20, 1828.

On April 27, 1846, congress passed a "joint resolution concerning the Oregon territory" (9 Stat. 109), by which the president was authorized "at his discretion, to give the government of Great Britain the notice required" for the abrogation of said article 3. In the preamble of this resolution it is recited:—"And whereas it has now become desirable that the respective claims of the United States and Great Britain should be definitely settled, and that said territory may, no longer than need be, remain subject to the evil consequences of the divided allegiance of its American and British population, and of the confusion and conflict of national jurisdictions, dangerous to the cherished peace and good understanding of the two countries." This led to the convention of June 15, 1846, "in regard to limits westward of the Rocky mountains" (9 Stat. 869), by which the forty-ninth parallel of north latitude was made the boundary between the two countries. In the preamble to this convention it is admitted and declared by the parties thereto,—"that the state of doubt and uncertainty which has hitherto prevailed respecting the sovereignty and government of the territory on the northwest coast of America, lying westward of the Rocky or Stony mountains, should be finally terminated by an amicable compromise of the right mutually asserted by the two parties over the said territory."

The place of plaintiff's birth—Fort George—now is, and I suppose in contemplation of law from the American standpoint, was at the date thereof, within the territory or realm of the United States. But as a matter of fact, the title to the country was then regarded as doubtful, unsettled and obscure; and this is apparent from the admissions above quoted from the respective preambles to the resolution and convention of April 27 and June 15, 1846. Even the country itself was regarded by a large portion of the people of the United States as a desert waste, not worth disputing with England about. In February, 1844, when a motion to give notice to abrogate article 3 of the convention of 1818 was being debated in the senate, Mr. Dayton, of New Jersey, read from the columns of the National Intelligencer an article on Oregon, taken from Prentice's Louisville

Journal, of which the following extracts are average specimens: "What there is in the territory of Oregon to tempt our national cupidity, no one can tell. Of all the countries on the face of this earth, it is one of the least favored of heaven. It is the mere riddlings of creation. It is almost as barren as the desert of Africa, and quite as unhealthy as the Campagna of Italy. * * * If the United States should ever need a country to which to banish its rogues and scoundrels, the utility of such a region as Oregon will be demonstrated." 13 Cong. Globe, p. 275. He also read from the Christian Advocate of February 7, 1844, as follows: "We have some opportunity, from our position, to found a correct estimate of the soil, climate, productions, and facilities of the country from the Rocky mountains to the Pacific ocean, as we have had a large mission there for several years, distributed in small parties over the territory; and, from all we have learned we should prefer migrating to Botany bay. With the exception of the lands of the Wallamet, and strips along a few of the smaller water courses, the whole country is among the most irreclaimable barren wastes of which we have read, except the desert of Sahara."

Under this state of things as to the title and occupancy of the country, and while his alien father is in the service of a British corporation, then exercising in the territory, by authority of the British parliament, large municipal power, the plaintiff is born within the lines of a post then occupied by said corporation as a place of business and defense. This being so, in my judgment, he was not born in the allegiance of the United States, but in that of the British crown.

The plaintiff being the child of an unnaturalized alien, and unnaturalized himself, cannot claim to be an American citizen, except upon the single ground, that he was born upon the soil, and subject to the jurisdiction of the United States. Nothing that has happened since his birth can add to or take away from the strength of his claim. The treaty of 1846, which definitely acknowledged the country south of the forty-ninth parallel to belong to the United States, contains no provision naturalizing the British subjects living south of that line, who may elect to become American citizens by remaining there, or otherwise. The case turns upon the single point—was the plaintiff born subject to the jurisdiction of the United States—under its allegiance?

Suppose the government of the United States had undertaken to exercise jurisdiction over the plaintiff before the treaty of 1846, when for the first time it actually obtained exclusive jurisdiction over the country? Suppose it had attempted by means of laws applicable to American citizens under like circumstances, to draft or tax him? How natural and forcible would have been the objection: "I am the child of a British father—a natural born British subject. True, I was born in Oregon, but by a treaty stipulation

the country was then, and is now, for the time being, British soil as to a British subject. I was, therefore, born subject to the jurisdiction and in the allegiance of the king of Great Britain, and am as truly a British subject as though I had been born on the banks of the Thames."

When, in 1818, the two governments entered into the treaty of "joint occupation," as it has been aptly called, they thereby agreed that this then unsettled and unknown country, might be occupied by the people of both nations—that it should "be free and open" "to the vessels, citizens, and subjects of the two powers"—without either of them losing their nationality, changing their allegiance, or passing beyond the jurisdiction and protection of their separate governments. As to the British subject and his children born here, the country was for the time being British soil, while to the American citizen and his offspring it was in the same sense American soil. Neither government was entitled to exercise any authority over the citizens or subjects of the other, or to assert the power and rights of a sovereign over them, or their effects, within this particular territory. If, prior to 1846, the plaintiff had died intestate and without heirs, leaving a large amount of personal property in the territory, there is no doubt but that the British crown would have claimed the escheat without a word of objection from the government of the United States.

When it is said that by the common law a person born of alien parents, and in the allegiance of the United States, is born a citizen thereof, it is necessarily understood that he is not only born on soil over which the United States has or claims jurisdiction, but that such jurisdiction for the time being is both actual and exclusive, so that such person is in fact born within the power, protection and obedience of the United States. Generally speaking, the various places in the world are claimed, or admitted for the time being, to be under the exclusive jurisdiction of some particular sovereign or government, so that a person born at any one of them is without doubt born in the allegiance of such particular sovereign or government. But that is not this case—which in this respect is a singular one. Its parallel has not been found in the books. The country of the plaintiff's birth was, at the time thereof, jointly occupied by the citizens and subjects of two governments in pursuance of a treaty to that effect. Under the circumstances, neither government can be considered as exercising general exclusive jurisdiction over the country and its inhabitants. It seems to me, that the only practical and just solution of the problem, is to consider the country for the time being, only to have been in the exclusive jurisdiction of each government as to its own citizens or subjects; and this is the view which congress appears to have taken of the matter in 1846, when, in the preamble to the resolution of

April 27, it deprecated "the evil consequences of the divided allegiance of its American and British population," and "the confusion and conflict of national jurisdiction" growing out of the continued joint occupation of the country.

A parallel case may hereafter arise out of the present joint occupation of the island of San Juan, at the head of the straits of Fuca. It is well known that the title to this island is in dispute between the United States and Great Britain, and that in the meantime, in pursuance of an informal convention or understanding between the two governments, the island is occupied by the forces of each. Now, if hereafter the island is given up to the exclusive jurisdiction of the United States, and in the meantime a child of a British subject is born there within the portion occupied by the British forces, could it be considered as born in the allegiance of the United States? Certainly not. The child, although born on soil which is subsequently acknowledged to be the territory of the United States, was not at the time of its birth under the power or protection of the United States, and without these, the mere place of birth cannot impose allegiance or confer citizenship.

Chancellor Kent says (2 Comm. 42): "To create allegiance by birth, the party must be born, not only within the territory, but within the allegiance of the government. If a portion of the country be taken and held by conquest in war, the conqueror requires (acquires) the rights of the conquered as to its dominion and government, and children born in the armies of a state while abroad, and occupying a foreign country, are deemed to be born in the allegiance of the sovereign to whom the army belongs. It is equally the doctrine of the English common law, that during such hostile occupation of a territory, if the parents be adhering to the enemy as subjects de facto, their children born under such temporary dominion, are not born under the allegiance of the conquered." For this latter clause, the author refers to Calvin's Case [7 Coke, 18a] and (note c) quotes Lord Coke as saying in that case: "An alien is a person out of the ligeance of the king. It is not extra regnum, nor extra legem, but extra ligeantiam. To make a subject born, the parents must be under the actual obedience of the king, and the place of birth be within the king's obedience, as well as within his dominion." Now, in 1823, the plaintiff's "place of birth"—Fort George—was no more within the obedience of the United States than is the Tower of London to-day. In Inglis v. Sailor's Snug Harbor, 3 Pet. [28 U. S.] 126, the supreme court, on a certificate of a difference of opinion from the circuit court for the Southern district of New York, held that, as a general rule all persons born in the state of New York prior to July 4, 1776, were born British subjects, but might thereafter elect to remain so or not, and

that all persons born therein after such date, were born citizens of such state, but that Inglis, who was born of a British subject in the city of New York after that date, and while the city was in the actual occupation of the British army, "was born a British subject under the protection of the British government, and not under that of the state of New York, and of course owing no allegiance to the state of New York." The necessary conclusion from the rule announced in this case, is also, that a person to be born in the allegiance of a particular government, must not only be born within its territory, but under its obedience—exclusive jurisdiction and power. Of course it matters not whether the exclusive jurisdiction of the United States was excluded from the place of birth of this plaintiff by force of arms or by treaty with Great Britain. The result is the same in each case.

Articles 14 and 15 of the constitution, commonly called the fourteenth and fifteenth amendments, have been cited by counsel for plaintiff as bearing upon this question of the plaintiff's citizenship and consequent right to vote. The latter simply provides that "the right of citizens of the United States to vote shall not be denied or abridged * * * on account of race, color, or previous condition of servitude." But as to who are "citizens of the United States" this article is silent— it being understood that that matter had been regulated or defined by article 14, § 1, which enacts: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside." Eliminate the words having reference to naturalized citizens, and the clause reads: "All persons born in the United States, and subject to the jurisdiction thereof, are citizens," etc. This is nothing more than declaratory of the rule of the common law as above stated. To be a citizen of the United States by reason of his birth, a person must not only be born within its territorial limits, but he must also be born subject to its jurisdiction—that is, in its power and obedience.

The only other construction of this clause that I can imagine possible, is the following: Taken literally, it does not appear to require that the person should be born "subject to the jurisdiction of the United States;" but if he was born within its territorial limits, whether under its jurisdiction or not, and afterwards becomes subject to such jurisdiction; he then and so long as this status continues, becomes and remains a citizen of the United States. Assuming, as a matter of fact, that the plaintiff was born in the United States, although in the allegiance of the king of Great Britain, this construction of the fourteenth amendment would include him as a citizen, because he is now, and since 1846 has been, subject to the jurisdiction of the United States. But I think such construction fanciful and artificial. It is not to be presumed that the amendment was made to the constitution to change the rule of the common law, but rather to declare and enforce it uniformly throughout the United States and the several states, and especially in the case of the negro.

Counsel for plaintiff, in reply to the fact that his client was born at a post under the flag of the Hudson Bay Company, a quasi public and political British corporation, endeavored by citations from the state papers to establish the fact that in 1817, the British government only held Fort George (Astoria) as a captured place, and that about that time it was delivered up to the United States. Astoria was in fact delivered to the United States in pursuance of article one of the treaty of Ghent (8 Stat. 218), for the restoration of places captured during the war of 1812, on October 6, 1818. 113 Cong. Globe, p. 218. But the fact so far as this action is concerned is not material. It is not claimed that Fort George was held by the British government at the time of plaintiff's birth therein, as a captured port or otherwise, but that it was occupied by a British corporation—British subjects—in pursuance of the treaty of joint occupation. It appears from the special verdict that the Northwest Company obtained possession of the place in 1813; and that thereafter the same was in the exclusive occupation and control of said company until its union with Hudson Bay Company in 1821, who thereafter occupied it exclusively, until 1846.

But I do not rest the conclusion—that the plaintiff was born in the allegiance of the king of Great Britain and not in that of the United States—on the mere fact that the plaintiff was born at a post of the Hudson Bay Company, rather than at any other point or place in the territory included in the treaty of joint occupation. It is admitted that the plaintiff's father was a British subject by birth, and while he lived in the territory—at least between 1818 and 1846—he was in the allegiance of the king of Great Britain, and his children wherever born therein, were born in the same allegiance and are British subjects.

It was also urged by counsel for plaintiff, that both Alexander and Thomas McKay— the plaintiff's grandfather and father—came to Oregon before the treaty of 1818, and therefore were not settlers under it. The fact is admitted, but I think the conclusion both illogical and irrelevant. The treaty operated upon those who were in the territory when it went into effect, to the same extent that it did upon those who came afterward. It placed them equally under the allegiance of their respective sovereigns, and limited them to the same use and occupation of the territory. It is immaterial whether plaintiff's ancestors came to the country or occupied it under the treaty or not. They were British subjects in any view of the matter,

and if, when the plaintiff was born, the territory by reason of treaty was British soil as to British subjects, without doubt he was born one. Again, it being admitted by the special verdict that Alexander McKay joined the expedition of Astor as a partner in the so-called American Fur Company, and sailed from the American port of New York, in the Tonquin, for the territory of Oregon, it is claimed that these facts show that the plaintiff's ancestors did not come to the country or occupy it under the treaty of joint occupation, and therefore the plaintiff was not born in the allegiance of the king of Great Britain.

In the settlement of Oregon, Alexander McKay is a historical character. He was a British subject and a member of the Northwest Fur Company. The new company which he formed in conjunction with Astor, and of which he was the principal partner, was substantially a company of Canadians and British subjects. All the partners, except Astor, and three fourths of the clerks and employés, were British subjects. McKay went from Montreal to New York en route to the mouth of the Columbia in a birch bark canoe, transporting it on a wagon across the portages between the St. Lawrence and the Hudson. While at New York, there being then apprehensions of a war between the United States and Great Britain, McKay had an interview with the British minister for the purpose of getting his advice how to act in case of a rupture between the two nations, in which he represented that himself and associates were British subjects going to the Columbia to trade under the American flag. Northwest Coast of America, c. 1. Gabriel Franchere. I see nothing in these facts to cast doubt upon the conclusion that the plaintiff was born of a British subject, in the allegiance of the British crown. Alexander and Thomas McKay came to the country British subjects, and the mere fact that they embarked at an American port, and that the former was a partner in a fur company, that called itself American for the convenience of trade or the exigencies of war, in no way affected their political status or that of the plaintiff's.

It is also insisted that the plaintiff is a citizen of the United States, and a voter under the operation of articles 14 and 15 of the constitution, on the ground that they apply to and include Indians—at least half-breeds —born within the limits of the United States. Article 15 secures the right of suffrage, ir-. respective of race, color or condition of servitude, to citizens of the United States, as defined by article 14. It follows that an Indian, whether of the whole or half blood who is a citizen of the United States, is entitled to vote, or rather he cannot be excluded from this privilege on the ground of being an Indian, as that would be to exclude him on account of race. But the Indian tribes within the limits of the United States have always been held to be distinct and independent political communities, retaining the right of self-government, though subject to the protecting power of the United States. Worcester v. Georgia, 6 Pet. [31 U. S.] 575. They have the right of use in the soil which can only be divested by the United States, with their consent by purchase or without it, by war. Godfrey v. Beardsley [Case No. 5,497].

The special verdict states that the plaintiff was born of a Chinook woman, but does not state who the Chinook Indians were, or where they lived. I suppose the court has judicial knowledge of a fact so well-known in the history of Oregon, as that the Chinook Indians at the period of the plaintiff's birth, were a well-known tribe living at or near the mouth of the Columbia river. Its language was the basis and principal element of the "jargon" which, during the first half of this century, was the general medium of communication between the white and the Indian tribes from the Umpqua river on the south, to the straits of Fuca on the north, while their one-eyed chief, "Old King Comcomly," has been immortalized in the classic pages of Irving's Astoria. As the northwestern boundary was finally acknowledged or established, this tribe was within the limits of the United States. The plaintiff is nine sixteenths Indian, eight of which he gets from his Chinook mother, and the other one from his Canadian father. As a matter of fact, the Indian blood predominating, he is not a half-breed, as claimed on the argument by his counsel. But I cannot perceive that it is material to consider whether he is a half-breed or not. In legal contemplation he is an American Indian, by virtue of his mother being a member of the Chinook tribe, or a British subject, without reference to his race, by virtue of being the son of Thomas McKay, and his birth in the allegiance of the British crown.

According to the case of U. S. v. Sanders [Case No. 16,220], the plaintiff follows the condition of his mother, and is an alien. It was held in that case that the issue of an Indian woman and a white man is an Indian, and vice versa; that the rule of the civil law—partus sequitur ventrem—prevailed. But the contrary is the rule of the common law in the analogous case of the issue of a marriage between a freeman and a neif. 2 Bl. Comm. 94. In such case, by that rule, the child follows the condition of the father. My impression is that the plaintiff ought to be deemed to follow the condition of his father. Congress seems to have taken this view of the matter in the passage of the act of September 27, 1850, granting land to settlers in Oregon, commonly called the "Donation Act." 9 Stat. 496. Section 4 of this act grants land to each white settler on the public lands, who is a citizen of the United States, or who has or will declare his intention to become such, "American half-breed

Indians included;" thereby excluding half-breeds, the children of alien fathers, as not Americans, but aliens. But it is not necessary to absolutely determine this question.

Suppose that the plaintiff should be held to follow the condition of his mother, and is therefore a Chinook Indian; is he then a citizen of the United States under article 14 of the constitution? According to the doctrine that has been uniformly held in regard to the status of the Indian tribes in the United States he is not. Being born a member of "an independent political community"—the Chinook—he was not born subject to the jurisdiction of the United States—not born in its allegiance. On the other hand, if the plaintiff is held to follow the condition of his father he is a Canadian of mixed blood, born in the allegiance of the British crown, and therefore a British subject. In neither case was he born a citizen of the United States, and can only become one by complying with the laws for the naturalization of aliens. True, as the law now stands, the plaintiff cannot be admitted to citizenship, because he is neither a "white alien" nor a person of "African nativity or descent." But that is a matter within the exclusive cognizance of congress.

By the constitution of Oregon (article 2, § 2) no person is entitled to vote at any election therein, unless, among other things, he is a citizen of the United States, or has declared his intention to become such, "conformably to the laws of the United States upon the subject of naturalization." This description of persons is broader than that contained in article 15 of the constitution of the United States, which does not include persons who have merely declared their intentions to become citizens. The act of congress under which this action is brought is enacted in pursuance of article 15, and only applies to citizens of the United States. 16 Stat. 140. On June 6, 1870, the plaintiff was not a citizen of the United States. This being so, he is not within the purview of the act and cannot maintain this action. If the defendant's refusal to permit the plaintiff to take the preliminary oath as to his qualifications, so as to give him a prima facie right to vote, was wrongful, as I think it was under the state law, the case is not within the act of congress. That only gives a remedy for such refusal in case of citizens of the United States.

A word in conclusion: I am aware that the ruling in this case, would exclude from the privilege of voting quite a number of persons of mixed blood—persons whose fathers were British subjects, and mothers, Indian women—who have heretofore often, if not uniformly been allowed to vote in this state. They have done so by common consent, and under the authority of a vague public opinion that these persons by remaining south of the forty-ninth parallel after the treaty of 1846, could, and thereby did, elect to become American citizens. But "public opinion is not any authority on a point of law;" and it appears in this instance as in others, "that common consent is sometimes a common error." The remedy, if any is deemed necessary, is with the leigslature, and not the courts.

There must be judgment for the defendant in bar of the action, and for his costs and disbursements.