[S. F. No. 8035. In Bank.—March 8, 1917.]

ETHEN ANDERSON, Petitioner, v. SHAFTER MATHEWS, · County Clerk of Lake County, Respondent.

CITIZENSHIP—TREATY OF QUERETARO—DESCENDANTS OF PERSONS LIVING IN TERRITORY ACQUIRED FROM MEXICO.—Article VIII of the treaty of Queretaro, providing that "Mexicans now established in territory previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty," shall become citizens of the United States if they remain in such territory for one year without declaring their intention to retain Mexican citizenship, only applies to persons living at the date of the treaty. To ascertain the citizenship of after-born children or descendants of the persons then living in the territory acquired from Mexico, recourse must be had to the laws of the United States.

ID.—INDIAN BORN IN CALIFORNIA—ABSENCE OF TRIBAL ORGANIZATION OR RECOGNITION BY UNITED STATES.—A person of the Indian race, who was born in the state of California after the making of such treaty and had always lived therein, affiliating and residing with a group of Indians having no tribal laws or regulations, and no organization or means of enforcing any such laws or regulations, and that acknowledged the jurisdiction of the state over them, and who was not a member of or a descendant from a member of any tribe or group of Indians whom the United States had ever recognized as a · distinct political community by treaty or otherwise, is a native citizen of the United States and of the state of California, by virtue

of the provision of the fourteenth amendment of the constitution of the United States declaring that "All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside." Such person is entitled to register as a voter under section 1 of article II of the state constitution.

ID.—CITIZENSHIP BY BIRTH—SUBJECT TO JURISDICTION OF UNITED STATES Ordinarily every person residing in the United States is subject to its jurisdiction, and if born here is, by that fact, a citizen. The only exception to this rule are persons who, although residing here, or born here, are, for some adventitious reason, subject to the jurisdiction of some other country or political community, as for example, resident ministers of some other country and their children born here, or members of Indian tribes recognized as such by the federal government.

ID.—INDIAN TRIBES RECOGNIZED BY UNITED STATES AS SEPARATE COMMUNITIES.—The Indian tribes recognized by the federal government are not subject to the laws of the state in which they are situated. They are under the control and protection of the United States, but they retain the right of local self-government, and they regulate and control their own local affairs and rights of person and property, except as Congress has otherwise specially provided by law. For this reason Indians of that description are not deemed to be "subject to the jurisdiction" of the United States, within the meaning of that phrase in the fourteenth amendment, and, though born here, they do not thereby become citizens.

ID. — CIVILIZED INDIAN LIVING SEPARATE FROM TRIBE — CITIZENSHIP UNDER DAWES ACT.—Such an Indian, who lives separate and apart from any recognized tribe, and works, dresses, eats, and lives with and maintains a lawful wife and his family, after the manner of civilized peoples, is a citizen of the United States, under section 6 of the act of Congress of February 8, 1887, known as the Dawes Act (24 U. S. Stats., p. 390).

ID.—ACTS NOT AMOUNTING TO TRIBAL RECOGNITION.—The establishment by the federal government of a school for the use of the Indians with whom such individual is affiliated, and the purchase of land for allotment to them, do not constitute a recognition of them as a distant tribe with independent self-government, and thus not "subject to the jurisdiction" of the United States, within the meaning of the fourteenth amendment.

APPLICATION for a Writ of Mandate directed to the County Clerk of Lake County.

The facts are stated in the opinion of the court.

Charles Kasch, and J. E. Pemberton, for Petitioner.

Robert Duncan, and H. B. Churchill, for Respondent.

SHAW, J.—The plaintiff prays for a writ of mandate against the defendant, as county clerk of Lake County, to compel the said defendant, as such clerk, to register plaintiff as an elector of Scotts Valley precinct in Lake County.

A demurrer and answer were filed to the petition, but the case has been submitted upon a stipulation between the parties in which all of the facts are stated bearing upon the case, and it is unnecessary to refer to the pleadings further.

Section 1 of article II of the constitution declares that "Every native citizen of the United States, every person who shall have acquired the rights of citizenship under or by virtue of the treaty of Queretaro," and who possesses certain other qualifications, all of which it is admitted are possessed by the plaintiff, shall be entitled to vote at all elections authorized by law. Under this provision the plaintiff is entitled to registration, provided he is a native citizen of the United States, or is a person who has acquired citizenship by virtue of the treaty of Queretaro.

The defendant refused registration to the plaintiff on the ground that he is of the Indian race, and that because of that fact, although born in this state, he is neither a native citizen of the United States, nor a person who acquired the rights of citizenship under the treaty of Queretaro.

The treaty of Queretaro, or Guadalupe Hidalgo, as it is often called, by which the territory embracing the present state of California was obtained from Mexico by the United States, was made at Guadalupe Hidalgo on February 28, 1848, was ratified on March 16, 1848, and was formally exchanged between the two governments at Queretaro on May 30, 1848. Article VIII thereof (9 U. S. Stats. 929) declares that "Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty," shall become citizens of the United States if they remain in such territory for one year without declaring their intention to retain Mexican citizenship. This provision establishes the status of persons then living within the territory referred to, but it does not relate to persons born in the ceded territory

after it became a part of the United States. It applies only to persons then living; "Mexicans *now* (then) established" in that territory. To ascertain the citizenship of after-born children or descendants of the persons then living in the territory acquired from Mexico we must look to the laws of the United States, not to the treaty of Queretaro. The plaintiff was born long after the making of that treaty, but he is a lineal descendant of Indians who were then living in that territory. The treaty can have no bearing upon the question of his citizenship, unless the fact that his ancestors were made citizens by that treaty, if it is a fact, is material thereto. The first question for consideration, therefore, is whether or not he is a citizen of the United States by reason of his birth therein after California became a part of the United States.

The fourteenth amendment of the constitution of the United States declares that, "All persons born or naturalized in the United States *and subject to the jurisdiction thereof*, are citizens of the United States and of the state wherein they reside." It was said by Field, J., while sitting in the circuit court, that, "Independently of the constitutional provision it has always been the doctrine of this country, except as applied to Africans brought here and sold as slaves, that birth within the dominion and jurisdiction of the United States of itself creates citizenship." (*In re Look Tin Sing,* 21 Fed. 905, 909; see, also, *McKay* v. *Campbell,* 2 Sawy. 118, 122, [Fed. Cas. No. 8840]; *Inglis* v. *Sailors' Snug Harbor,* 3 Pet. (28 U. S.) 99, 120, [7 L. Ed. 617, 625]; *United States* v. *Wong Kim Ark,* 169 U. S. 649, 658, [42 L. Ed. 890, 894, 18 Sup. Ct. Rep. 456]; *Lynch* v. *Clarke,* 1 Sand. Ch. (N. Y.) 583, 639.) In *McKay* v. *Campbell,* the court said: "To be a citizen of the United States by reason of his birth, a person must not only be born within its territorial limits, but he must also be born subject to its jurisdiction—that is, in its power and obedience." The plaintiff's place and time of birth, under this doctrine, makes him a citizen of the United States, unless the fact that he is of the Indian race, together with such tribal relations as he may have, place him in the class of persons who are not born within the "jurisdiction of the United States," or who are not "born . . . subject to the jurisdiction thereof," as it is expressed in the fourteenth amendment.

Indians inhabiting the territories embraced within the United States, prior to the acquisition of territory from Mexico in 1848, were divided into separate tribes, sometimes called nations. The political relation of these tribes or nations to the United States first came up for consideration in the Supreme Court of the United States in 1831, in the case of *Cherokee Nation* v. *Georgia*, 5 Pet. (30 U. S.) 1, [8 L. Ed. 25]. It was held that an Indian tribe, though not a foreign nation, and though under the protection of the United States, is yet "a distinct political society, separated from others, capable of managing its own affairs and of governing itself." And in *Worcester* v. *Georgia*, 6 Pet. (31 U. S.) 515, [8 L. Ed. 483], it was said: "The Indian nations had always been considered as distinct, independent, political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial." (6 Pet. 559, [8 L. Ed. 501].) This doctrine has been uniformly followed and enforced ever since with regard to all Indian tribes within the territories mentioned, including those within the country situated in the district formerly known as the territory of Oregon. (*United States* v. *Wong Kim Ark*, 169 U. S. 649, 681, [42 L. Ed. 890, 902, 18 Sup. Ct. Rep. 456] ; *McKay* v. *Campbell*, 2 Sawy. 118, 132, [Fed. Cas. No. 8840] ; *United States* v. *Osborn*, 6 Sawy. 406, [2 Fed. 58] ; *Ex parte Reynolds*, 5 Dill. 398, [Fed. Cas. No. 11,719] ; *Jackson* v. *Goodell*, 20 Johns. (N. Y.) 188, 193; *The Kansas Indians*, 5 Wall. (72 U. S.) 737, [18 L. Ed. 667] ; *Scott* v. *Sandford*, 19 How. 393, 403, [15 L. Ed. 691, 700].) In *Elk* v. *Wilkins*, 112 U. S. 94, [28 L. Ed. 643, 5 Sup. Ct. Rep. 41], the right of a member of one of these Indian tribes to register as a voter in the state of Nebraska was considered. He had fully and completely surrendered himself to the jurisdiction of the United States, but it did not appear that this was done under any federal law or treaty, or that the United States had accepted his surrender, or in any way treated or recognized him as a citizen. Speaking of these Indian tribes the court there said (112 U. S. 102, [28 L. Ed. 643, 5 Sup. Ct. Rep. 41]) :

"Indians born within the territorial limits of the United States, members of, and owing immediate allegiance to, one of the Indian tribes (an alien, though dependent, power), although in a geographical sense born in the United States,

are no more 'born in the United States and subject to the jurisdiction thereof,' within the meaning of the first section of the fourteenth amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States, of ambassadors or other public ministers of foreign nations.''

The Indian tribes which were the subject of these decisions were all well known and recognized as distinct communities having laws and regulations binding upon each member, and which were in some manner enforced by the tribal authorities. There were other Indians, in various places in the different states of the Union, of tribes which, to use the words of Justice Johnson in his dissenting opinion in *Fletcher* v. *Peck*, 6 Cranch (10 U. S.) , at page 146, [3 L. Ed. 181], had ''totally extinguished their national fire, and submitted themselves to the laws of the states,'' or, as stated in *Worcester* v. *Georgia*, 6 Pet. (31 U. S.) 580, [8 L. Ed. 483, 508], were ''small remnants of tribes, . . . surrounded by white population, and who, by their reduced numbers, had lost the power of self-government,'' and had become subject to state laws. In *Danzell* v. *Webquash*, 108 Mass. 133, it is said that these Indians in Massachusetts, though forming well-known tribes, ''having never been recognized by any treaties or executive or legislative acts of the government of the United States as independent political communities, were under the control of the legislature of the state.'' The decision in *Elk* v. *Wilkins*, *supra*, is avowedly based entirely on the premise that Elk ''was born a member of one of those Indian tribes within the limits of the United States which still exists and is recognized as a tribe by the government of the United States,'' and that the United States had never provided for or recognized his separation from his tribe, accepted him as a citizen, or assumed jurisdiction over him except in connection with its political relations with his tribe.

Under the facts stipulated, the status of the plaintiff, with respect to these two classes of Indians, is not clear. He was born in California, after its admission into the Union, and has always resided there. At the time of the treaty of Queretaro his ancestors were wild and uncivilized Indians settled in and permanently inhabiting Indian villages in the region now forming Lake County. Then, and for several years thereafter, they lived in tribes and maintained tribal

relations, the nature of which is not stated. The name of the tribe is not given. It does not appear that it was known by any name. The United States has never made any treaty with the tribe, or with any tribe of which it ever formed a part, or with the particular group or village of Indians with whom the plaintiff associates and resides. It does not appear that the original tribe had any form of government, laws or regulations of any kind. He is one of a group of Indians residing in Lake County, and who, although surrounded by white neighbors, practically associate exclusively with each other and with other Indians in that and adjacent counties. The group has no tribal laws or regulations, and no organization or means of enforcing any such laws or regulations. The only sort of communal organization or semblance of political autonomy it has consists of the fact that one of them has the title of "Captain," and is treated as their leader or spokesman and receives some deference and respect on that account. But he has no authority. Disputes are sometimes submitted to him for settlement, but his decisions are considered wholly advisory. Each party accepts or rejects them as he chooses, and there is neither enforcement nor means of enforcement thereof.

Some years ago a white man named Bucknall donated a tract of land to another group of Indians in the vicinity, on which said Indians reside as in a village. In this village the United States has established a school for the benefit of all the Indians of the vicinity, and it provides transportation thereto for the children of the plaintiff's group or village. This land is held in trust for the benefit of all these Indian villages, and they all contribute to pay the taxes thereon. They have never been taxed on other property, and the plaintiff has not otherwise paid taxes.

A few years ago the federal government purchased a tract of land in Lake County for a home for these Indians, including the group of which plaintiff is a member, upon which any family of the group can live and make its home. It has been subdivided into lots for allotment, in severalty, to the beneficiaries. The plaintiff has selected a lot and has established a residence thereon where he lives when not employed elsewhere. He has not received any certificate or patent for the allotment. The Indian agent at Round Valley Reservation furnishes some food and clothing to these Indians in cases

of extreme necessity "and attends to their ordinary wants." No explanation is given of the meaning of the phrase just quoted. In no other manner has the United States dealt with these Indians or recognized their distinct or communal existence, separate from other inhabitants of the state.

The plaintiff and the other Indians of his group maintain themselves and their families chiefly by doing farm work for wages on the farms of their white neighbors. They also catch fish and gather acorns, which they dry and store for winter food. When at work for. farmers they live in houses furnished by their employers, or in camps in the fields near their work, returning to their village when the employment ends. White employees also camp in the fields at such times in similar manner. They all acknowledge themselves bound by state laws, and do not dispute the jurisdiction of the state over them. The plaintiff was married under state law, and when the petition was filed he was living with his family in a house on the land of a farmer for whom he was working. He expects to return to the village when his employment ceases. It is not the custom of those Indians to marry by state law. They usually take a woman and live with her according to the Indian custom, by her parents' consent, but without a ceremonial marriage after our forms. They wear clothes similar to those worn by their white neighbors.

From these circumstances we think it is clear that the plaintiff is a citizen of the United States and entitled to registration as a voter. Ordinarily every person residing in the United States is subject to its jurisdiction, and if born here is, by that fact, a citizen. The only exceptions to this rule are persons who, although residing here, or born here, are, for some adventitious reason, subject to the jurisdiction of some other country or political community, as, for example, resident ministers of some other country and their children born here, or members of Indian tribes recognized as such by the federal government. The Indian tribes recognized by the federal government are not subject to the laws of the state in which they are situated. They are under the control and protection of the United States, but they retain the right of local self-government, and they regulate and control their own local affairs and rights of persons and property, except as Congress has otherwise specially provided by law. (*Kansas*

*Indians,* 72 U. S. 737, 756, [18 L. Ed. 667, 673] ; *United States*
v. *Kagama,* 118 U. S. 375, 381–384, [30 L. Ed. 228, 6 Sup.
Ct. Rep. 1109] ; *Wall* v. *Williamson,* 8 Ala. 48, 52; *Turner* v.
*Fish,* 28 Miss. 306, 311; *Boyer* v. *Dively,* 58 Mo. 510, 529.)
For this reason Indians of that description are not deemed
to be "subject to the jurisdiction" of the United States,
within the meaning of that phrase in the fourteenth amend-
ment and in the decisions first above cited, and, though born
here, they do not thereby become citizens.

The plaintiff, and the group of Indians with whom he asso-
ciates, do not belong to any tribe that was ever known or
recognized as such by the United States as a distinct political
community.   The tribe, so far as we know, never had a tribal
government of any sort.   Admitting that the original tribe
may have had such government, yet the plaintiff's group
never had any form of self-government of any kind.   Neither
the members of the group nor, so far as known, the members
of the tribe, were subject to, or owed allegiance to, any gov-
ernment, except that of the United States and the state of
California, and, prior to 1848, that of Mexico.   The reason
for the rule laid down in *Elk* v. *Wilkins, supra,* declaring
that a tribal Indian is not a citizen of the United States, is
wholly wanting here, and therefore this case is governed by
the general rule that the place of birth confers citizenship.
The plaintiff and his group rather belong to that class of
Indians described in *Danzell* v. *Webquish,* 108 Mass. 133, and
*Fletcher* v. *Peck,* 6 Cranch (U. S.), 146, [3 L. Ed. 181], as
Indians who have lost their power of self-government and be-
come subject to state laws, and who accordingly must be citi-
zens by birth, since they have never been subject to any
jurisdiction other than that of the United States.

Another consideration leads to the same conclusion, with
respect to the plaintiff particularly.   Section 6 of the act of
Congress of February 8, 1887, known as the Dawes Act (24
U. S. Stats. 390), provides that "every Indian born within
the territorial limits of the United States who has voluntarily
taken up, within said limits, his residence separate and apart
from any tribe of Indians therein, and has adopted the habits
of civilized life, is hereby declared to be a citizen of the United
States, . . . whether said Indian has been or not, by birth
or otherwise, a member of any tribe of Indians" within the

CLXXIV Cal.—35

United States.    The tribes of Indians here referred to must
be taken to include only the tribes recognized as such by the
United States, and constituting independent communities un-
der the decisions above cited.    The provision contemplates
that Indians not of such tribes may become citizens in the
manner specified.    This would include the plaintiff, if it be
conceded that he would not be a citizen but for this statute.
He voluntarily lives separate and apart from any recognized
tribe, he works, dresses, eats, and lives with and maintains his
lawful wife and his family, after the manner of civilized
peoples.    He comes within the terms of the statute, and is,
therefore, a citizen.

The plaintiff earnestly contends that all Indians residing in
California at the time of the cession of the territory to the
United States in 1848 were citizens of Mexico under the ''Plan
of Iguala,'' declaring that ''All the inhabitants of New
Spain, without distinction, whether Europeans, Africans, or
Indians, are citizens of this monarchy, with a right to be
employed in any post according to their merits and virtues''
(*United States* v. *Ritchie,* 58 U. S. 525, 538, [15 L. Ed. 236,
240]) ; that the ancestors of the plaintiff were ''Mexicans
now established'' in the territory ceded to the United States
by the treaty of Queretaro, that accordingly they became citi-
zens of the United States by article VIII thereof, and that
plaintiff became a citizen by reason of his ancestry and
birthplace.    It has been said that the translation of the word
''habitantes,'' in the original statement of the Plan of Iguala,
as ''inhabitants,'' in the version above given, is not accu-
rate, that the term ''habitantes'' in Mexican usage, ''is limited
to persons having a place of abode, and does not embrace
vagrants or nomads.''    (*United States* v. *Santistevan,* 1 N. M.
583, 591.)    There may be doubt, therefore, whether Indians
of the northern part of California, such as plaintiff's ances-
tors, were intended to be included in the phrase ''Mexicans
now established'' in the treaty of Queretaro.    Inasmuch as
the proposition is not necessary to the plaintiff's case, we
express no opinion concerning it.

It is proper to add that the establishment of a school by
the federal government for the use of these Indians, and the
purchase of land for allotment to them, does not constitute
a recognition of them as a distinct tribe with independent self-

government, so as to bring them within the doctrine of *Elk* v. *Wilkins, supra.*

Let a writ of mandate issue as prayed for.

Sloss, J., Melvin, J., Henshaw, J., Lorigan, J., Lawlor, J., and Angellotti, C. J., concurred.