## UNITED STATES v. ROGERS.

*(District Court, W. D. Arkansas. April 27, 1885.)*

1. CRIMINAL LAW AND PROCEDURE—MOTION FOR WARRANT OF REMOVAL.
   In acting on a motion for a warrant of removal, the judge is performing a judicial function, and in the performance of such function he may look into the proceedings of the commissioner, or the court in which the indictment was found, for the purpose of enabling him to properly determine questions pertaining to the removal and grant or refuse the order accordingly.

2. SAME—QUESTION FOR DECISION OF JUDGE.
   The question the judge is called to pass on in a proceeding for removal is, where the case is to be tried, where a trial can be had. In passing on the question, the judge can go behind the indictment. He must inquire where a trial can be had. He must send the party to the court which has jurisdiction to try. The judge is to determine for himself whether the party charged should be held or removed or discharged.

3. SAME—JURISDICTION.
   Jurisdiction can be raised at any stage of a criminal proceeding. It is never presumed, but must always be proved, and is never waived by a defendant. Jurisdiction to try, embraces jurisdiction of the person, of the place, and of the subject-matter. There must be a concurrence of all of these to give the right to try.

4. SAME—OBJECTION, HOW RAISED.
   The person accused and who is asked to be removed, can raise the question of jurisdiction without invoking the aid of the writ of *habeas corpus*, or he may do so by the aid of such writ.

5. SAME—REV. ST. § 1014.
   Under section 1014 of the statute of the United States, the judge of the district is invested with plenary power to grant or refuse the warrant of removal, and he is but exercising sound judicial discretion when he looks into the question of jurisdiction, and in looking into such question he may go behind the indictment.

6. SAME—HABEAS CORPUS.
   By *habeas corpus* the jurisdiction of a court to try can be inquired into under

the law of the United States, by any judge or court which has a right to issue the writ.

7. CHEROKEE NATION—TITLE TO LANDS.

The Cherokee Nation of Indians hold what is called the "Cherokee Outlet" by substantially the same kind of title it holds its other lands. The title to all their lands was obtained by grant from the United States. This title is a base, qualified, or determinable fee, without the right of reversion, but only the possibility of reversion in the United States. This, in effect, puts all the estate in the Cherokee Nation.

8. SAME—ACT OF JANUARY 6, 1883.

Prior to the act of congress of January 6, 1883, the Cherokee Outlet was in the jurisdiction of the United States district court for the Western district of Arkansas. That act did not put it in the jurisdiction of the United States court of Kansas, as then and now it is Indian country, set apart and occupied by the Cherokees.

9. SAME—"OCCUPIED."

The word "occupied" or "occupation," may be used in law in connection with other expressions, or under the peculiar facts of the case, as to signify actual residence. Under the peculiar facts here, actual residence of the Cherokee Nation would be an impossibility.

10. SAME—POSSESSION.

When congress, in the act of January 6, 1883, used the word "occupied" it could have meant no more than the possession of the country. To have possession does not require actual residence.

11. SAME—LEGAL POSSESSION.

The word "occupy," as used in the act of congress above referred to means subject to the will and control, *possessio pedis*, and it is synonymous with "subjection" to the will and "control." Wherever there is a subjection of land to the will and control of another, with title in him, it is occupied by that other —it is in the actual legal possession of that other.

12. SAME—OCCUPATION BY NATION.

The usual legal sense of the word "occupy," as applied to land, is where a person exercises physical control over such land. Hence, when a nation or body of people have the title to land, and the same is subject to its will and control, it is occupied by it,—legally, it is in its possession.

## On Application for Warrant of Removal and *Habeas Corpus.*

The petitioner for *habeas corpus* in this case was, on the eleventh of September, 1884, at a term of the United States district court of Kansas, begun and held at Wichita, indicted for the crime of arson, in the Indian Territory. Said indictment, in effect, alleges that the crime was committed in that part of the Indian Territory lying north of the Canadian river and east of Texas and the 100th meridian, not set apart and occupied by the Cherokees, Creeks, and Seminole Indian tribes; and that the same was committed within the exclusive jurisdiction of the United States district court for the district of Kansas. A certified copy of the indictment was sent to the marshal of the Western district of Arkansas, with the request that he obtain a warrant of removal, and bring petitioner before the district court of the United States for the district of Kansas, sitting at Wichita. The marshal of this district on the fifteenth day of December, 1884, applied to the judge of this court for a warrant for the arrest of the petitioner. The same was issued. The petitioner was, on the thirtieth of December, 1884, arrested on said warrant, and by the marshal of this district brought before the judge of this court, when the district at-

torney of this district applied to the judge for a warrant of removal; and simultaneous with such application the petitioner filed his petition for a writ of *habeas corpus*, in which he prayed that he might be discharged from arrest, for the reason that the alleged crime for which he is indicted, was not committed in that section of the Indian country over which the district court of Kansas has jurisdiction, but that the same, if any offense against the laws of the United States, was committed in that part of the Indian country lying north of the Canadian river, and west of Texas and the 100th meridian, set apart and occupied by the Cherokees, for which they hold a patent, which evidences their title, obtained from the United States. Said patent is dated December 31, 1838. In other words, that the court in which the indictment was found, had no jurisdiction over the place where the crime was committed, and consequently the indictment could not be lawfully found by the grand jury, and that the court would not have the right to try the same; that no trial can be lawfully had of the alleged crime in the district court of Kansas, and that, therefore, the petitioner cannot be lawfully removed to said district for trial; that consequently the warrant for his arrest should not have been issued by the judge of this court; and that now he is restrained of his liberty in violation of the constitution and laws of the United States. Other reasons are set up by the petitioner in his response to the return of the marshal to the writ of *habeas corpus*, but they not being necessary to a decision of the case, it is not deemed important to set them out.

*Barnes & Mellette* for petitioner.

*W. H. H. Clayton,* U. S. Dist. Atty., for the United States.

PARKER, J. This case is before me on the application of District Attorney Clayton for a warrant for the removal of petitioner to the district of Kansas, as well as upon the writ of *habeas corpus,* issued upon application of petitioner. Section 1014 of the Revised Statutes of the United States, among other things, provides that "for any crime or offense against the United States the offender may, by any justice or judge of the United States, * * * be arrested and imprisoned, or bailed, as the case may be, for trial before such court of the United States as by law has cognizance of the offense. * * * And when any offender or witness is committed in any district other than that where the offense is to be tried, it shall be the duty of the judge of the district where such offender or witness is imprisoned seasonably to issue, and of the marshal to execute, a warrant for his removal to the district where the trial is to be had." If it be true that the district court of Kansas has no jurisdiction to try the offense alleged to have been committed by petitioner, this court had no right to issue the warrant for his arrest; and although said warrant is regular on its face, yet it would be without authority of law, as such warrant was issued solely with a view to his removal to the district court of Kansas sitting at Wichita. If that is not a court where a trial can be had for the alleged offense of arson, and

not the court which has cognizance of the offense, the petitioner cannot be held under this warrant.

The question presents itself under the statute of removal, how far the judge of the district can or may go in his inquiry into the case, before he takes action in the shape of ordering the removal of a person charged with crime in a district other than the one where he may be arrested. In *U. S.* v. *Brawner*, 7 FED. REP. 86, *In re James*, 18 FED. REP. 854, and *In re Buell*, 3 Dill. 116, it was, in effect, held that in acting on a motion for a "warrant of removal" the judge is performing a judicial function, and in the performance of such function, he may look into the proceedings of the commissioner, or the court in which the indictment was found, for the purpose of enabling him to properly determine questions pertaining to the removal, and grant or refuse the order accordingly. If the party has been indicted, can the judge go behind that indictment to inquire into the jurisdiction? The very question that he is called on to investigate and pass on in a proceeding for removal is where the offense is to be tried. What court has jurisdiction of it? Where the trial is to be had. Now, is he precluded from doing this by an indictment? The statute is very broad. He must inquire where the trial is to be had. He must send the party to the district where the offense is to be tried; to the court which has jurisdiction, where the trial is to be had. The judge of the district must judicially determine whether the prisoner shall be taken to another district for trial, and that he may refuse his warrant when it appears that the removal should not be made, or when he should admit the party to bail. The judge is to determine for himself whether the party charged should be held or removed. *U. S.* v. *Brawner*, 7 FED. REP. 86; Conkl. Treat. (4th Ed.) 582; Murray, U. S. Courts, 29; *Re Buell*, 3 Dill. 116, at p. 120; *U. S.* v. *Jacobi*, 14 Int. Rev. Rec. 45; *U. S.* v. *Pope*, 24 Int. Rev. Rec. 29; *U. S.* v. *Volz*, 14 Blatchf. 15; *U. S.* v. *Haskins*, 3 Sawy. 262; *Re Alexander*, 1 Low. 530; *U. S.* v. *Shepard*, 1 Abb. 431; *Re Doig*, 4 FED. REP. 193; and cases cited in these opinions.

In some of these cases there was a writ of *habeas corpus*, and in some, the original examination was before the district judge, and in one the question arose in the district to which the removal was made on motion to quash the indictment.

Judge HAMMOND, in *U. S.* v. *Brawner*, says:

"In none of these cases does it seem to have been treated as a matter of much importance by what form of procedure the action of the judge is invoked, and in none is it denied that he may determine for himself whether the removal is proper."

In the discretion of the judge he may take the indictment as *prima facia* evidence of jurisdiction; but suppose the party, when an application for removal is made, objects to the removal on the ground that the court to which he is sought to be removed, has no jurisdiction to try him, he certainly has the right to, in this way, raise the question

of jurisdiction. Jurisdiction can be raised at any stage of a criminal proceeding. It is never presumed, but must always be proved; and it is never waived by a defendant. If this principle be correct, it follows that the party who is charged with a crime, and arrested in one district to be removed for trial to another, can raise the question, as an objection to his removal, that he cannot be tried in that other, or that the trial cannot be had there for want of jurisdiction in the court either over the person, the subject-matter, or the place where the crime was committed. There is no question in my mind of the right of a person accused to raise the question of jurisdiction on the hearing of an application for removal, without invoking the aid of the writ of *habeas corpus*. *In re James*, 18 FED. REP. 853; *U. S.* v. *Brawner*, 7 FED. REP. 86. And when said question is raised it becomes the duty of the judge of the district to investigate the case so far at least as to ascertain if the court to which the accused is asked to be removed, is the one where the trial can be had. Under the statute the judge of the district is invested with plenary power to grant or refuse the warrant of removal, and he is but exercising sound judicial discretion when he looks into the question of jurisdiction. It must be remembered that this case is before me both on an application for removal of petitioner and on *habeas corpus,* and if there could be any question about the right of the judge to look to the question of jurisdiction on an application for a warrant of removal, there can be none as to his right to do so when the case is brought before him by *habeas corpus*. *In re Buell*, 3 Dill. 116; *U. S.* v. *Brawner*, 7 FED. REP. 86.

But it is objected by counsel that the case cannot be heard on *habeas corpus,* as the warrant for the arrest of Rogers was legal; that the officer held him legally by virtue of such writ, and he being in legal custody, he cannot be discharged by this writ at this stage of the case. If he had been arrested on a warrant of a commissioner, and committed to await a warrant of removal, the action of the commissioner could be inquired into by *habeas corpus,* or without it on the application for removal. *U. S.* v. *Brawner*, 7 FED. REP. 86; *In re Buell*, 3 Dill. 116. The petitioner is in the same condition when held by the marshal under the warrant issued by the judge of this district as though he had been committed by a commissioner to await a warrant of removal. The effect of the warrant was to commit him to the marshal to await the action of the judge in ordering his removal, as would be the effect of the action of a commissioner when he was committed by him to await a warrant of removal. In the one case, the judge, by *habeas corpus,* reviews the action of the commissioner. In the other he reviews his own action. By *habeas corpus* the jurisdiction of a court can be inquired into under the laws of the United States by any judge or court which has the right to issue the writ. *In re Buell*, 3 Dill. 16; *In re James*, 18 FED. REP. 853; *U. S.* v. *Brawner*, 7 FED. REP. 86.

*In re Buell* there was an indictment against Buell in the District of Columbia for libel, and he was arrested upon a warrant of a commissioner in the Eastern district of Missouri, where he sued out a writ of *habeas corpus* before Judge TREAT. He took up the question of jurisdiction, and discharged Buell on the ground that the indictment failed to show jurisdiction. This ruling was affirmed by Judge DILLON. If there is no jurisdiction to try, the party is held in custody contrary to the constitution and laws of the United States, and in that case this great writ of right, known as the writ of *habeas corpus*, can be invoked from any officer who has a right, under the laws of the United States, to issue it.

There can, I think, be no doubt that the petitioner can raise the question of jurisdiction on an application for removal either when the motion for a writ of removal is pending, and on such motion, or by *habeas corpus*, and that the judge can, if the question of the jurisdiction of the court to which the prisoner is asked to be sent for trial is raised, go behind the indictment to ascertain *where the trial is to be had.* Then the material question in this case is, did the district court of Kansas have jurisdiction of this alleged offense? The proof submitted in this case shows that a number of persons had banded together under the lead of one D. L. Payne, for the purpose of making a raid into the Indian country; that they had entered that country and made a settlement at a point four miles south of Hunniwell, Kansas, and the thirty-seventh parallel of north latitude, and between the ninety-seventh and ninety-eighth degrees of west longitude, a little north-west of the Nez Perce reservation on the Shaskaskie river; that these persons were intruders in the Indian country. They were there against and in violation of the laws of the United States. The president of the United States had issued his proclamation for their expulsion and arrest. The petitioner in this case had gone there as "acting Indian agent" of the five civilized tribes to point out to the military the intruders who were to be expelled and arrested. That the petitioner set fire to and caused to be burned a small board shanty, which the intruders could not, or would not, remove after being requested by petitioner to remove same. If this is an offense against the laws of the United States, it was committed in that part of the Cherokee country known as the "Cherokee Outlet." This country, together with the other part of its lands, was granted to the Cherokee Nation, as a nation, by the treaties between the Nation and the United States, made May 6, 1828. Indian Treaties 56 and 57, the fourteenth of February, 1833, Id. 63, and December 29, 1835, Id. 61. By these treaties the Cherokee Nation was granted a perpetual outlet west, and a free and unmolested use of all the country lying west of the western boundary line of the 7,000,000 acres of land granted in and by the same treaties.

On the thirty-first of December, 1838, a patent was issued by the government of the United States, in accordance with treaty stipula-

tions for all its lands, including the outlet west. The language of the descriptive part of that patent touching the outlet is "that the United States further guaranty to the Cherokee Nation a perpetual outlet west, and a free and unmolested use of all the country west of the western boundary of said 7,000,000 of acres as far west as the sovereignty of the United States and their right of soil extend." The "granting clause" is that the United States have "given, granted, and by these presents do give and grant, unto the Cherokee Nation the two tracts of land surveyed," which two tracts included the outlet. The *habendum* clause is "to have and to hold the same, together with all the rights, privileges, and appurtenances thereunto belonging, to the said Cherokee Nation," forever subject, however, "to the right of the United States to permit other tribes of red men to get salt on the Salt plain on the western prairie referred to in the second article of the the treaties of the twenty-ninth of December, 1836, which Salt plain has been ascertained to be within the limits prescribed for the outlet, and subject further to the condition provided by the act of congress, of the twenty-eighth of May, 1830," and which condition is that "the lands hereby granted, shall revert to the United States, if the Cherokee Nation become extinct or abandon the same." By looking at the title of the Cherokees to their lands, we find that they hold them all by substantially the same kind of title, the only difference being that the outlet is incumbered with the stipulation that the United States is to permit other tribes to get salt on the Salt plains. With this exception, the title of the Cherokee Nation to the outlet is just as fixed, certain, extensive, and perpetual as the title to any of their lands. This court held in the case of *U. S.* v. *Reese*, 5 Dill. 405, that "the Cherokees hold their land by title different from the Indian title, by occupation; they derived it by grant from the United States. It is a base, qualified, or determinable fee without the right of reversion, but only a possibility of reversion, in the United States. This in effect puts all the estate in the Cherokee Nation."

Prior to the act of congress of January 6, 1883, all of the country lying west of Missouri and Arkansas, known as the "Indian Territory," was attached by a law of the United States to the judicial district of Arkansas. And the district court of such district had jurisdiction over all the country described above as Indian country for the trial of offenses, when committed by a certain class of persons, or upon a certain class of persons. Up to the time of the act above referred to there was no question as to the Cherokee outlet being in the jurisdiction of the district court for the Western district of Arkansas. It was Indian country and Indian country, lying west of Missouri and Arkansas, and a part of what was known as *the Indian country*. On the date above named, congress passed an act entitled "An act to provide for holding a term of the district court of the United States, at Wichita, Kansas, and for other purposes, which provides, by section 2, "that all that part of the Indian Territory lying north of the Can-

adian river and east of Texas and the 100th meridian, *not set apart and occupied* by the Cherokee, Creek, and Seminole Indian tribes, shall, from and after the passage of this act, be annexed to and constitute a part of the United States judicial district of Kansas, and the United States courts at Wichita and Fort Scott, in the district of Kansas, shall have exclusive original jurisdiction of all offenses committed within the limits of the territory hereby annexed to said district of Kansas against any of the laws of the United States now or that may hereafter be operative therein." 22 St. 400.

By the treaties and patent above referred to the Cherokee outlet was, beyond question, *set apart* to the Cherokees and to that extent was in a condition the converse of that which is necessary to attach it to the district of Kansas. It matters not what may have been the extent of their title. If they had a title of any degree whatever, it was set apart to them. Now, at the time of the commission of this alleged offense, was it occupied by the Cherokee tribe of Indians? If it was set apart and occupied by this tribe, it is not in the jurisdiction of the district court of Kansas.

The evidence in this case shows that the Cherokee Nation has constantly, and all the time since it obtained the outlet, claimed it, and exercised acts of ownership and control over it. The nation has collected at different times a grazier's tax from white men who were grazing their stock on it. Individual Indians have gone on it and fenced up large tracts of land on the outlet. Different individual Indians have gone out and lived on it, and now live on it. That since the passage of this law of January 6, 1883, the Cherokee Nation has leased to citizens of the United States for grazing purposes 6,000,000 acres of this outlet. That under the provisions of the sixteenth article of the treaty of 1866 with the United States, it has sold tracts of land on this outlet for reservations to the Pawnees, Poncas, Nez Perces, Otoes, and Missouras. The very country where this alleged offense was committed, was, at the time of its commission, leased to the cattle men as a part of the 6,000,000-acre lease. That the Cherokee Nation never has abandoned any part of the outlet except what it has sold. It claims the title and possession of the outlet and of that part of it where this alleged offense is shown to have been committed. The United States, the grantor, has admitted its title to it. Then, does the Cherokee Nation occupy the country where the offense was committed? It becomes necessary in this connection to ascertain what is meant by the word "occupy." It is well to remember that the country was set apart to the Cherokee Nation,—not to individual Cherokees, but to the Cherokee Nation as such. When congress used the phrase "not set apart and occupied," did it mean to imply that to constitute an occupation the Cherokee Nation must actually reside on the land, as a tenant resides in the house of his landlord? How could the nation do that? This would be impossible. Did it mean to say that all the country upon which individual Indians, members

of the tribe, did not actually reside, was after the passage of the act to be in the jurisdiction of the district court of Kansas? If so, the jurisdiction of that court would be of the most rambling, meandering, and uncertain character; as it is a notorious fact that there are millions of acres scattered all over the Cherokee Nation, which are not occupied either by the nation or its citizens in the sense of actual residence upon the land. We find that the word "occupied" or "occupation," may be so used in law, in connection with other expressions, or under the peculiar facts of the case, as to signify actual residence. Under the peculiar facts here, actual residence of the Cherokee Nation would be an impossibility and an absurdity. When congress used the word "occupied," it could have meant no more than possession of the country. To have possession does not require actual residence. Words are to be taken according to their customary legal meaning. We find that, ordinarily, in the law, the words "occupation," or "occupy," or "occupied," mean, as used, subject to the will and control *possessio pedis;* that the words "occupation," or "occupy," or "occupied," are synonymous with subjection to the will and control. Wherever there is a subjection of land to the will and control of another with title in him, it is occupied by that other. It is in the actual legal possession of that other. *Lawrence* v. *Fulton,* 19 Cal. 690; *Plume* v. *Seward,* 4 Cal. 94; *Bailey* v. *Irby,* 2 Nott & McC. (S. C.) 343; *Jackson* v. *Woodruff,* 1 Cow. 285; *Jackson* v. *Halstead,* 5 Cow. 219. Messrs. Rapalje & Lawrence, in their Law Dict. vol. 2, p. 893, in defining the word "occupation," say, "In its usual sense, it is where a person exercises physical control over land." Hence, when a nation or body of people have the title to land, and the same is subject to their will and control, it is occupied by them, —legally, it is in their possession.

The government of the United States occupies all of its public lands. The Cherokee Nation occupies, and is in the actual legal possession of, all its lands to which it has title, and to which it has not relinquished such title. This, in my judgment, is the only reasonable interpretation which can be given to this word "occupied," as used in the act of congress of January 6, 1883. If this be so, there is left no room for any other construction of this act of congress than that it does not put in the jurisdiction of the district court of Kansas any of the Cherokee country to which the nation has title, and which is subject to its will and control. But it is claimed in this case that the Cherokees no longer have any title to the country where the alleged offense is said to have occurred, as they sold it to the Cheyennes and Arapahoes in 1866.

We find by the treaty of May 22, 1866, between the United States and the Cheyennes and Arapahoes, a reservation was set apart for them, which included, as a part thereof, the very country where this alleged crime was committed. By the terms of the second article of the treaty they were not required to settle on said reservation until

such time as the United States shall have extinguished all claims of title thereto on the part of other Indians to said reservation. They did not settle on this reservation, and claimed that they did not understand the location of it as defined by the treaty with them of August 16, 1868, and therefore refused to go upon it. The president of the United States, by executive order of August 10, 1869, located them on their present reservation on the North Fork of the Canadian river. By the sixteenth article of the treaty of July 27, 1866, between the United States and the Cherokees, it was agreed "that the United States may settle friendly Indians in any part of the Cherokee country west of 96 deg., to be taken in compact form, in quantity not exceeding 160 acres for each member of each of said tribes thus to be settled; the boundaries of each of said districts to be distinctly marked, and the land conveyed in fee-simple to each of said tribes, to be held in common, or by their members in severalty, as the United States may decide; said lands thus disposed of to be paid for to the Cherokee Nation at such price as may be agreed on between the said parties in interest, subject to the approval of the president, and if they should not agree, then the price to be fixed by the president; the Cherokee Nation to retain the right of possession of and jurisdiction over all of said country west of 96 deg. of longitude, until thus sold and occupied, after which their jurisdiction and right of possession to terminate forever as to each of said districts thus sold and occupied. The plain meaning of this provision of the treaty is that when the United States should desire any of the outlet for the settlement of friendly Indians on the same, that the Cherokees would sell the same to such Indians, and make title in fee-simple to them for the same,—the purchase price to be paid by them, or the government of the United States for them, to the Cherokees. But until the country, or any part of it, is *so sold* and *occupied,* the right of possession and jurisdiction over all of said country west of 96 deg. of longitude to be retained by the Cherokees. Here is a plain recognition of the title of the Cherokees by the government of the United States, with their right of possession and jurisdiction. Inasmuch as there never was any sale by the Cherokees to the Cheyennes and Arapahoes of the country where this offense was committed, that the same was never sold by them and occupied by the Cheyennes and Arapahoes, the country is still in the condition of being set apart and occupied by the Cherokees, and does not come under the designation of *Indian country not set apart and occupied by the Cherokees.* Therefore, it is not in the jurisdiction of the United States district court for the district of Kansas, and that court is not one in which a trial of the case of Rogers can be had, and the "petitioner" cannot be removed to said district, and the "warrant of removal" will be refused, and the petitioner in the proceeding by *habeas corpus* will be discharged.