[Crim. No. 5286.   In Bank.   Aug. 17, 1954.]

THE PEOPLE, Respondent, v. RAYNA TOM CARMEN, Appellant.

Mason A. Bailey and Leonard J. Bloom for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Winslow Christian, Wallace G. Colthurst and Arlo E. Smith, Deputy Attorneys General, Andrew J. Eyman, Special Deputy Attorney General, Walter L. Chandler, District Attorney (Madera), and George R. McClenahan, Deputy District Attorney, for Respondent.

SHENK, Acting C. J.—A rehearing was granted to give further consideration to the question of receiving additional evidence on appeal in death penalty cases. For reasons hereinafter stated we have concluded that it may not be so received.

The defendant pleaded not guilty and not guilty by reason of insanity to a charge of the murder of Wilbur McSwain. One jury found him guilty of first degree murder, without recommendation, and another found him sane. The judgment sentenced him to death, and the case is here on automatic appeal. There was no motion for a new trial.

The defendant was previously tried on the same charge and found guilty of murder. At that trial he was also found guilty, under a second count, of assault with intent to murder Alvin McSwain, the brother of Wilbur. On appeal this court reversed the judgment of conviction of murder for refusal to give manslaughter instructions and because of the giving of erroneous instructions on first degree murder, but the judgment of conviction on the second count was affirmed. (*People v. Carmen,* 36 Cal.2d 768 [228 P.2d 281].)

The evidence at the second trial was substantially the same as at the first. Briefly summarized it shows that on the evening of April 22, 1950, the defendant drove his car to a dance at Yosemite Forks in Madera County. Riding with him were Ella McSwain, Wilbur McSwain, Josephine Davis and Henry Chenot. Alvin McSwain was also at the dance. After the dance many of those attending, including the above mentioned persons, went to a place known as Kilroy's Last Stand, where soft drinks and sandwiches were sold. An

altercation occurred in which Alvin McSwain, Henry Chenot and Ted Davis, Josephine's son, pushed the defendant to the ground. When he got up he threatened to kill the "whole family" and then left for his home 35 to 40 miles away. He obtained a rifle, loaded it, and drove to within $\frac{1}{8}$ to $\frac{1}{4}$ of a mile from the McSwain home. He approached the house carrying the rifle, and, finding no one there, sat on the front porch. After 15 or 20 minutes he heard a car arrive and approached it. In the front seat of the car were Marion Donnell and Wilbur McSwain, and in the back seat were Ted Davis and Alvin McSwain. The defendant said he was going to kill all of them except Donnell, and he fired a shot across the front seat, striking Wilbur who was then standing on the other side of the car. He then walked toward the back of the car and fired three shots into the back seat, inflicting three wounds on Alvin. Immediately afterwards he was disarmed. Wilbur died from his wound several hours later.

The second trial was solely for the murder of Wilbur, and the defendant urges that it was error to admit evidence of the shooting of Alvin, because, he asserts, the assault was an independent offense other than that for which he was being tried. The shooting of Alvin occurred a few seconds after the defendant shot Wilbur. Alvin and Wilbur were both of the same family, and the defendant had threatened to kill the whole family. ■ These and other circumstances of the case clearly show that the shooting of Alvin was a part of the same transaction in which Wilbur was killed, and evidence pertaining to it was therefore admissible. (Code Civ. Proc., §§ 1850, 1870, subd. 7; Pen. Code, § 1102; *People* v. *O'Bryan,* 165 Cal. 55, 59 [130 P. 1042]; *People* v. *Manasse,* 153 Cal. 10, 12 [94 P. 92]; *People* v. *McClure,* 148 Cal. 418, 421 [83 P. 437]; *People* v. *Teixeira,* 123 Cal. 297, 298 [55 P. 988]; *People* v. *Crowley,* 13 Cal.App. 322, 325-326 [109 P. 493].) Its relevancy on the issue of the defendant's intent in shooting Wilbur is obvious. (*People* v. *Bermijo,* 2 Cal.2d 270, 277 [40 P.2d 823]; *People* v. *O'Bryan, supra,* 165 Cal. 55; *People* v. *Miller,* 121 Cal. 343 [53 P. 816]; *People* v. *Craig,* 111 Cal. 460 [44 P. 186]; *People* v. *Walters,* 98 Cal. 138 [32 P. 864].) The case of *People* v. *Lane,* 100 Cal. 379 [34 P. 856], relied upon by the defendant, did not involve factors here present such as the threat by the defendant that he was going to kill the "whole family" and the carrying out of his threat by killing Wilbur and by attempting to murder Alvin as part of the same affray. (See *People* v.

*Teixeira, supra,* 123 Cal. 297, 298, pointing out that in the Lane case one of the two shootings was no part of the other shooting.)

In connection with the admission of the foregoing evidence, the defendant asserts that the court improperly instructed the jury. After pointing out to the jury that such evidence had been admitted the court went on to say that it was admitted for a limited purpose only, "not to prove distinct offenses or continual criminality, but for such bearing, if any, as it might have on the question whether the defendant is innocent or guilty of the crime charged against him in this action. You are not permitted to consider that evidence for any other purpose. . . . The value, if any, of such evidence depends on whether or not it tends to show: (1) the identity of the person who committed the alleged crime in question in this case, if it was committed; or (2) that the defendant had a motive for the commission of the offense charged against him in this action; or (3) that the defendant entertained the intent which is a necessary element of the alleged crime for which he now is on trial, as pointed out in other of my instructions; or (4) that the defendant was familiar with the means alleged to have been used in the commission of the crime of which he is accused in this action; or (5) that the defendant possessed knowledge that might have been useful in the commission of the crime for which he is now on trial; or (6) that there existed in the mind of the defendant a plan, scheme, system or design, into which fitted the commission of the offense for which he now is on trial." Thereafter the court stated that the jury could consider the evidence for purposes (4) and (5), but could not consider it in connection with those purposes where the other offense involved was a "later offense." The defendant's point seems to be that the People knew that the Alvin shooting was a later offense than the killing of Wilbur and therefore should not have offered the instruction embracing (4) and (5). The instruction was somewhat inconsistent, for it said, in the listing of purposes, that the Alvin affair could be considered and, afterwards, that a later offense could not be considered. If there was error, however, we fail to see how it could have prejudiced the defendant. He admitted on the witness stand that he fired the shot which killed Wilbur and that he was thoroughly familiar with the manner of operating the gun, and, accordingly, there was no serious question at the trial with respect to the matters referred to in parts (4) and (5) of the instruction.

There is no merit in the defendant's claim that he was not permitted to explain his "physical condition." He testified that he had a pain in his head during and after the drive from Kilroy's Stand to his home and stated that it hurt particularly where there was a scar on his head. He was asked what caused the scar and answered: "I was in an automobile accident, I had a fractured skull, unconscious seven days— Mr. Eyman ·[Special Deputy Attorney General] : I am going to object as incompetent, irrelevant and immaterial, if the Court please. The Court: Sustained, it calls for expert testimony." There was no attempt to strike the defendant's answer, and the sustaining of the objection did not eliminate the answer which had already been given. The defendant was then asked if "that particular part of your head hurt a little more than the rest of it?" and he replied, "Yes, it did." No further questions were asked on this subject, and the matter was dropped. It does not appear that there was any error in sustaining the objection. ■ The materiality or relevancy of the question asked of the defendant was not apparent, and counsel for the defendant did not attempt to explain the purpose of the question or offer to show how an answer might be relevant. In the absence of such a showing no prejudice appears. (*People* v. *Danielly,* 33 Cal.2d 362, 376 [202 P.2d 18] ; *People* v. *Reyes,* 194 Cal. 650, 652 [229 P. 947] ; *People* v. *McGann,* 194 Cal. 688, 692-694 [230 P. 169].)

On the trial of the plea of not guilty by reason of insanity, the court, over the defendant's objection, permitted the prosecuting attorney to open the case and to make the opening argument. Counsel for the defendant declined to argue the case on the insanity plea, and that issue was submitted to the jury after appropriate instructions. The defendant claims that, inasmuch as he had the burden of proof, such order of proof and argument constituted error. That question appears to be settled. ■ "No section of the Penal Code specifically directs the order of the trial upon a plea of not guilty by reason of insanity, and it has been repeatedly held that defendant has no right to open and close the argument to the jury (*People* v. *Hickman* (1928), 204 Cal. 470, 482 [268 P. 909, 270 P. 1117] ; *People* v. *Goold* (1932), 215 Cal. 763, 766 [12 P.2d 958] ; *People* v. *Kimball* (1936), 5 Cal.2d 608, 611 [55 P.2d 483] ; see, also, *People* v. *Hardy* (1948), 33 Cal.2d 52, 65-66 [198 P.2d 865] ) although the trial court may permit him to do so (see *People* v. *Lee* (1930), 108

348

Cal. App. 609, 613 [291 P. 887]).'' (*People* v. *Letourneau*, 34 Cal.2d 478, 495 [211 P.2d 865].)

At the time set for oral argument of this appeal Mr. Robert Peckham, an assistant United States attorney, appeared before this court and stated that there was reason to believe that the crime was committed in ''Indian country'' as that term is defined by the federal statutes, that the defendant is an Indian and, therefore, that the United States may have exclusive jurisdiction over the matter. Subsequently defendant filed an application to produce additional evidence on appeal to show that he is an Indian and that the land on which the crime was committed was an Indian allotment. Thereafter the People filed a document, signed by the prosecution alone, which was entitled ''Stipulation re Application to Produce Evidence.'' It stated, among other things, that defendant is an Indian but is a citizen of California who has never been subject to any restrictions on account of his race and has at all times enjoyed all the rights and privileges of any other citizen, that decedent Wilbur McSwain was an Indian, that letters patent to the lots where the crime was committed were issued by the United States to Maggie Jim, an Indian, that the letters patent are still held in trust by the United States of America and that the lots have never been part of an Indian reservation. The defendant signed and filed a separate so-called ''stipulation'' in which he disagreed with some of the matters set forth in the document filed by the People but stated that defendant and Wilbur McSwain were Indians, that the alleged crime took place on lands allotted by the United States in trust for Maggie Jim, an Indian, and that the lands are still held in trust.

The briefs of the parties have presented numerous questions concerning the propriety of considering a stipulation of facts made on appeal, the meaning of the particular documents filed by the parties, the construction and effect of the pertinent federal statutes, and the constitutionality of such statutes if they are interpreted to vest exclusive jurisdiction over the crime in the federal government. We have concluded that the proposed offer to produce additional evidence on the appeal should be denied. Furthermore, even assuming that additional evidence could be received on appeal in this class of cases by stipulation or otherwise, the facts stated in the so-called ''stipulation'' as well as shown in the entire record are insufficient to show exclusive jurisdiction in the federal courts.

■ Since the defendant committed the crime in a county of this state, it may not be assumed that any special circumstances existed which would deprive the state of jurisdiction. (*People* v. *Collins*, 105 Cal. 504, 509 [39 P. 16].) ■ He cannot supplement the record by means of his application to produce additional evidence on appeal. Section 4 of article VI of the Constitution provides that the "Supreme Court shall have appellate jurisdiction on appeal from the superior courts . . ., *on questions of law alone,* in all criminal cases where judgment of death has been rendered. . . ." [Italics added.] Section 4¾ of article VI of the Constitution and section 956a of the Code of Civil Procedure permit receipt of additional evidence on appeal only where trial by jury is not a matter of right or has been waived, and it has been definitely held that an application such as that made by the defendant must be denied where, as here, a jury trial was not waived. (*People* v. *Mendes,* 35 Cal.2d 537, 546 [219 P.2d 1] ; see also *People* v. *Cowan,* 38 Cal.App.2d 144, 152-154 [100 P.2d 1079].)

■ The evidence presented at the trial is not sufficient to permit a determination that there is exclusive federal jurisdiction in the present case, and we do not pass on the question of what remedies may be available to the defendant to show alleged lack of jurisdiction in the state court. Nothing in the record indicates that the location of the crime was "Indian country" within the meaning of any of the statutes which have been cited. (See, e.g., 18 U.S.C. §§ 1151, 1152, 1153, and 3242.) ■ While there was evidence that defendant and the victim were "Indians," the use of this term, without more, shows only that the persons were Indian by race and blood. That fact is insufficient to vest in the federal government exclusive jurisdiction over a crime committed in Indian country, because such jurisdiction does not exist when the crime involves Indians who have been emancipated in some manner, as, for example, by severing tribal relations and taking on civilized habits or by receiving a conveyance of allotted lands by patent in fee from the federal government. (25 U.S.C. § 349; *Louie* v. *United States,* 274 F. 47, 49 (murder) ; *People* v. *Ketchum,* 73 Cal. 635, 638-639 [15 P. 353] (recognizing the principle but not indicating whether the murder involved was committed in Indian country] ; *State* v. *Bush,* 195 Minn. 413 [263 N.W. 300, 302-303] ; *State* v. *Campbell,* 53 Minn. 354 [55 N.W. 553, 554, 21 L.R.A. 169] ; *State* v. *Monroe,* 83 Mont. 556 [274 P. 840, 842-843] (manslaughter) ; *People* v. *Livingstone* (Sup.Ct., N.Y.), 123 Misc.

605 [205 N.Y.S. 888, 894-895] ; *State* v. *Nimrod*, 30 S.D. 239 [138 N.W. 377, 378-379] ; *State* v. *Howard*, 33 Wash. 250 [74 P. 382, 384-385] (murder) ; see also *Irvine* v. *District Court*, 125 Mont. 398 [239 P.2d 272, 275] (burglary) ; *State* v. *Big Sheep*, 75 Mont. 219 [243 P. 1067, 1070, 1071].) ▮ These cases are to the effect that an Indian who has become emancipated is to be treated like any non-Indian for the purposes of·jurisdiction in a case such as this, and it is settled that the state courts have jurisdiction, in the absence of an Indian treaty, where a non-Indian commits a crime against another non-Indian in Indian country. (*New York* v. *Martin*, 326 U.S. 496, 497 et seq. [66 S.Ct. 307, 90 L.Ed. 261] ; *Draper* v. *United States*, 164 U.S. 240, 242 et seq. [17 S.Ct. 107, 41 L.Ed. 419] ; *United States* v. *McBratney*, 104 U.S. 621, 624 [26 L.Ed. 869] ; see *Williams* v. *United States*, 327 U.S. 711, 714 [66 S.Ct. 778, 90 L.Ed. 962].)

In *People* v. *Pratt*, 26 Cal.App.2d 618, 622-623 [80 P.2d 87], there is language, unnecessary to the decision, to the effect that the principles of the cases dealing with emancipated Indians do not apply where the defendant has committed murder or one of the other major crimes designated in what is now section 1153 of title 18 of the United States Code. The Louie, Ketchum, Monroe, Howard and Irvine cases, cited in the preceding paragraph, involved those major crimes, and the only decision cited in the Pratt case does not support its statement. The language in the Pratt case must therefore be disapproved insofar as it is inconsistent with the views expressed herein.

▮ The two documents entitled "stipulation," even if given the effect of a stipulation to the extent that they agree on some of the facts, are likewise insufficient to bring this case within the cited statutes pertaining to federal jurisdiction over offenses committed by or against Indians in Indian country. Insofar as the status of the defendant and Wilbur McSwain as Indians is concerned, the stipulation adds nothing to the evidence produced at trial because it, in effect, relates merely to the race and descent of these persons and does not disclose whether they were Indians of the type subject to federal jurisdiction or whether they were emancipated. ▮ Although the stipulation indicates that the crime was committed on allotment lands held in trust for an Indian and thus may have taken place in "Indian country" (18 U.S.C. § 1151), this alone, as we have seen, does not establish exclusive federal jurisdiction. Accordingly, since the stipu-

lated facts are insufficient to show that the courts of this state are without jurisdiction, we need not consider whether this court can properly determine a jurisdictional question upon the basis of facts contained in a stipulation made upon appeal.

Finally, the defendant asserts that the penalty imposed should be reduced. That cannot be done, however, in the absence of prejudicial error. (*People* v. *Thomas,* 37 Cal. 2d 74 [230 P.2d 351]; *People* v. *Odle,* 37 Cal.2d 52 [230 P.2d 345].) Here there is none.

The application to produce additional evidence is denied. The judgment is affirmed.

Edmonds, J., Traynor, J., Spence, J., and Peek, J. pro tem.,* concurred.

SCHAUER, J.—I concur in the judgment.

I agree that the evidence in the record is prima facie sufficient to prove that the state courts of California possess and have exercised jurisdiction over both the defendant and the crime of which he has been convicted, and I further agree that there is no stipulation before the court establishing facts sufficient to show that the state courts of California lack jurisdiction either in respect to the defendant or the crime.

CARTER, J.—I dissent.

I agree with the majority that ''where trial by jury is a matter of right'' and a case has been tried by a jury, an appellate court cannot receive additional evidence on appeal. It does not necessarily follow, however, that an appellate court cannot consider stipulations and admissions of jurisdictional facts which are not part of the record. Where the parties join in a stipulation of facts on appeal the court is not thereby required to determine factual matters but remains strictly within its constitutional jurisdiction of deciding ''questions of law alone.'' Although a number of cases, both in California and other jurisdictions, have considered the question of stipulations and admissions of fact on appeal, no case has been found that adequately discusses this problem.

The closest California case is *People* v. *Mooney,* 176 Cal. 105, 107 [167 P. 696], which involved an appeal from a conviction of murder where the death penalty was imposed.

*Assigned by Chairman of Judicial Council.

The court held that it could not consider a stipulation of the attorney general, in which defendant joined, that certain new evidence had been discovered after the denial of a motion for new trial and the taking of the appeal which led the attorney general to believe that, in the interests of justice, another trial should be had. After quoting section 4 of article VI of the Constitution, the court stated (at p. 107 of 176 Cal.) : "The provision means that an appeal in such cases is allowed solely for the purpose of obtaining the determination of this court as to whether there has been any error of law in the proceedings of the trial court. We have no other question to determine, and may lawfully determine no other question. If we find no substantial error of law, we must affirm the judgment of the lower court. It is clear, too, that in the consideration of such an appeal for this limited purpose, we are confined to the record sent to us from the court below." This language ignores the principle, noted above, that where the parties join in a stipulation of facts on appeal the court is not thereby required to determine factual matters but remains strictly within its constitutional jurisdiction of deciding "questions of law alone." Moreover, there is nothing in the wording of article VI, section 4, which specifically requires an appellate court to be "confined to the record" in the sense that it cannot look at stipulations and admissions of facts outside the record of the trial court.

The only other California case that appears to be in point is *People* v. *Mesa*, 121 Cal.App. 345, 347-348 [8 P.2d 920]. There the court held that "the statements of counsel and the admission of the attorney-general in their briefs for the purpose of supplying the omissions in the record" could not be considered to establish who requested a particular instruction which defendant attacked on appeal. The appellate jurisdiction of District Courts of Appeal in criminal cases, like that of this court, is limited to determination of "questions of law alone" (Const., art. VI, § 4b), and the opinion, as in the Mooney case, does not discuss the possibility that the use of such statements and admissions is proper under the court's constitutional powers. Moreover, the authorities cited by the court in the Mesa case do not support its conclusion.

In other jurisdictions the cases are in conflict as to whether stipulations or admissions on appeal as to matters not in the record can be considered. Some cases hold that they will be considered. (*State* v. *Goodager*, 56 Ore. 198 [108 P.

185] [admission on appeal concerning part of building where killing occurred] ; *Commonwealth* v. *Jester,* 256 Pa. 441 [100 A. 993, 994] [affidavits of defendant admitted by state to be substantially correct] ; see *State* v. *Bogen,* 13 N.J. 137 [98 A.2d 295, 298-299] ; *State* v. *Miller,* 187 S.C. 271 [197 S.E. 310, 311].)  Other cases hold that they will not be considered. (*Hunter* v. *State,* 43 Ariz. 269 [30 P.2d 499, 501] [statement on appeal made by defendant conceded to be true by the attorney general] ; *Adams* v. *State,* 44 Ga.App. 573 [162 S.E. 164] ; *People* v. *Loftus,* 400 Ill. 432 [81 N.E.2d 495, 498-499].) In none of the out-of-state cases, however, is there any discussion of the principles involved in determining whether or not a stipulation or admission on appeal will be considered, and none of them appears to involve jurisdictional facts.

While the majority refuses to decide the point, the attorney general argues that this court cannot consider stipulations on appeal as to jurisdictional facts because, he asserts, jurisdiction is a question of fact for the jury and it would be a deprivation of the state's right of jury trial for the court to consider any evidence not presented to the jury. In this connection he argues that the state produced evidence to show that defendant committed a crime in California and asserts that all questions relating to federal jurisdiction are matters of defense.  He relies on *People* v. *Collins,* 105 Cal. 504, 509 [39 P. 16], where it was held that federal jurisdiction over crimes committed on property owned by the United States is a question of fact and that, therefore, an information which merely alleged that a crime was committed within a certain county was sufficient although it failed to allege that the crime was not committed in those areas of the county subject to exclusive federal jurisdiction. (See also *People* v. *Megladdery,* 40 Cal.App.2d 748, 762-764 [106 P.2d 84].) Under the principles set forth above, however, it would seem that once the necessary facts are established by stipulation of the parties, the question of whether there is exclusive federal jurisdiction over the crime would be solely a matter of law.  If the parties have established the jurisdictional facts by stipulation, they would not be deprived of their right to a jury determination because no question for the jury would remain, and they would have, in effect, waived any objection to lack of a jury trial on such facts.

As a practical matter, where the essential facts can be settled by stipulation of the parties, and where all questions of law can be determined on the appeal, it would seem un-

necessary to require the defendant to go through the motions of instituting an additional proceeding, such as habeas corpus. There is nothing in the California Constitution which prevents us from considering the stipulation of the parties, and in my opinion this court can and should do so in the present case.

As a preliminary matter, the attorney general now argues that "the parties have not entered into a stipulation of facts." Each party filed a separate "stipulation" herein, and the two documents are different in substance and language with respect to many items. Stipulations, of course, are contracts upon the terms of which the parties must come to an agreement. (See 23 Cal.Jur. 822.) Attached to the document offered by the People, however, is a copy of a letter to defendant's counsel stating that "this is as far as we can go in any stipulation of facts" and that if defendant had any objection to "any of the facts appearing in the stipulation or if you join in the stipulation we would appreciate it if you would advise the court in the premises." This letter seems to have left it open for defendant to accept or reject the People's stipulation in whole or in part. The defendant's stipulation was in response to that of the People and agreed with some items but expressly rejected others. Accordingly, I will proceed upon the theory that the parties have made a stipulation with respect to all matters as to which the two documents are substantially in accord.

It is stated in each document that defendant is an Indian, but this must be interpreted to refer only to his race and blood because the People qualified their stipulation with the statement that defendant has never been subject to any restrictions on account of his race and has at all times enjoyed all rights and privileges of any other citizen of California. Both documents state that Wilbur Dan McSwain, the victim, "was an Indian," but, unlike the statement relating to defendant, no qualification is made by the People with respect to the status of McSwain. For this reason we should probably treat McSwain as an "Indian" not only as far as race and descent are concerned but also for the purposes of the federal statutes which use the word "Indian." Some indication of the intent of the parties in using the word "Indian" may be derived from the fact that the documents submitted by both parties were entitled "stipulation [regarding] application to produce evidence," since the "application" which is thus referred to clearly indicates that the word "Indian" was there

used for purposes of considering the federal statutes. It was also stipulated that the alleged crime took place on certain described lots in Madera County which are a part of the Sierra National Forest, that the United States, on November 26, 1920, issued an allotment* to the land to Maggie Jim, an Indian, and that the land is still held in trust by the United States of America. In summary, it appears that by stipulation it was shown that the deceased, Wilbur Dan McSwain, was an Indian; that the defendant, Rayna Tom Carmen, is an Indian, and that the crime was committed on the Maggie Jim Allotment which was comprised of lands held in trust by the United States Government for a 25-year period (Federal Register, November 14, 1944; 9 F.R. 1 3699; Executive Order 9500).

The first question which we must consider is whether the federal government in 1950, the year of the alleged murder, had exclusive jurisdiction over crimes of this type in any case involving Indians and Indian country. The People contend that California then had at least concurrent jurisdiction in such situations, and they assert that the applicable federal statutes should not be interpreted to give the federal laws and courts exclusive control and that the wardship theory of federal power over Indians is outmoded. They also urge, in this connection, that exclusive federal jurisdiction is inconsistent with federal legislation, adopted in 1924, which provides that *all* Indians born in the United States are citizens.

On behalf of defendant, it is contended that the state court was without jurisdiction over him in that exclusive jurisdiction in such cases is vested in the United States and its courts by reason of sections 1151, 1152, 1153 and 3242 of the United States Code Annotated, as amended May 24, 1949. (U.S.C.A., title 18.)

Section 1151 provides as follows: ''Except as otherwise provided in sections 1154 and 1156 of this title [those sections have reference to sales of liquor to Indians and the definition of the term 'Indian country' as it relates to the liquor laws], the term 'Indian country,' as used in this chapter, means (a) all lands within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-

---

*The ''stipulation'' filed by the People refers to ''letters patent'' and does not contain the word ''allotment,'' but the People's brief on jurisdiction (p. 6) and petition for rehearing (p. 19) state that the land was an ''allotment in trust to the Indian Maggie Jim and heirs.''

of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) *all Indian allotments, the Indian titles to which have not been extinguished,* including rights-of-way running through the same.'' (Emphasis added; June 25, 1948, ch. 645, 62 Stats. 757, amended May 24, 1949, ch. 139, § 25, 63 Stats. 94.)

Section 1152 provides: ''Laws governing. Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

''This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulation, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.'' (June 25, 1948, ch. 645, 62 Stats. 757.)

Section 1153 provides in pertinent part: ''Offenses committed within Indian country. Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.'' (The second paragraph of this section relates to rape; the third paragraph to burglary. Both provide that the crimes shall be defined as provided by the laws of the state in which they were committed. Burglary is to be punished in accordance with the laws of the state in which it is committed.) (June 25, 1948, ch. 645, 62 Stats. 758, amended May 24, 1949, ch. 139, § 26, 63 Stats. 94.)

Section 3242 provides that ''All Indians committing any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny on and within the Indian country, shall be tried in the same courts, and

in the same manner, as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States." (June 25, 1948, ch. 645, 62 Stats. 827, amended May 24, 1949, ch. 139, § 51, 63 Stats. 96.)

I have concluded that defendant's position must be sustained. The sections define "Indian country" as including an Indian allotment, the Indian title to which has not been extinguished and as being within the exclusive jurisdiction of the United States and that crimes committed by Indians against other Indians shall be punished under the general laws of the United States.

The People argue that defendant was a citizen of the United States and of this state and for that reason, our courts have jurisdiction. That contention was answered adversely to the People in *United States* v. *Nice*, 241 U.S. 591 [36 S.Ct. 696, 60 L.Ed. 1192], wherein it was said (p. 598): "Citizenship is not incompatible with . . . continued guardianship, and so may be conferred without completely emancipating the Indians or placing them beyond the reach of congressional regulations adopted for their protection."

The status of Indians as citizens seems immaterial in determining whether the federal government has exclusive jurisdiction over offenses in Indian country. In 1924 Congress provided that *all* Indians born in the United States are citizens of the United States. (8 U.S.C.A. § 1401, formerly 8 U.S.C.A. § 3.) Accordingly, all such Indians are citizens of the state in which they reside. (U.S. Const., Amdt. XIV.) It has been stated in analogous cases that the grant of citizenship to Indians does not mean that they are no longer wards of the federal government or subject to its guardianship and control. (See *Board of Comrs. of Creek County* v. *Seber*, 318 U.S. 705, 715, 718 [63 S.Ct. 920, 87 L.Ed. 1094] [exemption of Indian's land from taxation]; *United States* v. *Nice*, 241 U.S. 591, 598 [36 S.Ct. 696, 60 L.Ed. 1192] [sale of liquor to Indians]; *Hallowell* v. *United States*, 221 U.S. 317, 324 [31 S.Ct. 587, 55 L.Ed. 750]; *Cramer* v. *United States*, 261 U.S. 219, 232 [43 S.Ct. 342, 67 L.Ed. 622]; *Winton* v. *Amos*, 255 U.S. 373, 391-392 [41 S.Ct. 342, 65 L.Ed. 684]; *United States* v. *Dewey County*, 14 F.2d 784, 788.) Moreover, it seems obvious that the statutory granting of citizenship to all Indians born in this country was not intended to amount to an indirect wholesale abandonment of federal control, particularly in view of the many federal statutes upon Indians which were left unchanged, and it would be more reasonable to ex-

pect that, if such were intended, more specific language would have appeared in the statutes.

In *Hallowell* v. *United States,* 221 U.S. 317, 324 [31 S.Ct. 587, 55 L.Ed. 750], the defendant was an Omaha Indian residing in Nebraska. He was a citizen of the United States and of the state in which he resided. He contended at the trial that the state court had jurisdiction. The Supreme Court held that the federal courts had jurisdiction and said: ". . . [T]he United States had not parted with the title to the lands, but still held them in trust for the Indians. In that situation its power to make rules and regulations respecting such territory was ample."

It is contended by the People that this state had jurisdiction in that it had never ceded jurisdiction over the land on which the crime occurred. In *United States* v. *McGowan,* 302 U.S. 535 [58 S.Ct. 286, 82 L.Ed. 410], it was held that the principle of exclusive federal jurisdiction over crimes involving Indians on Indian reservations is not based on a cession of such jurisdiction by the states to the federal government but is based on the constitutional authority of the United States to deal with the Indians. It is argued by the People that whether the defendant was a ward of the United States (as held in *United States* v. *Kagama,* 118 U.S. 375 [6 S.Ct. 1109, 30 L.Ed. 228]) was a question of fact which should have been raised at one of defendant's two trials, and that the burden was on defendant to prove such wardship, or jurisdiction, as a defense. In *United States* v. *Rogers,* 23 F. 658, it was held that the matter of jurisdiction in a criminal proceeding is never presumed; that it must always be proved and is never waived as a defense. It was further held there that the question of jurisdiction can be raised at any stage of the proceeding. (See also *United States* v. *Anderson,* 60 F.Supp. 649, 650, holding that if the court is without jurisdiction of the subject matter, its proceeding is a nullity.) "Even the consent of the accused cannot confer jurisdiction, and it is an issue that can be made at any stage of the proceedings, . . ." In *Costa* v. *Banta* (a civil case), 98 Cal.App.2d 181, 182 [219 P.2d 478], it was held that "Although the jurisdiction of that court was not questioned during the trial, it is well established that questions of jurisdiction are never waived and may be raised for the first time on appeal." In *State* v. *Pepion* (1951), 125 Mont. 13 [230 P.2d 961], the defendant, an Indian, committed larceny within the limits of an Indian reservation. The court held that he was subject

to applicable federal laws and was under the exclusive jurisdiction of the United States courts. It was there held that the state district court was without jurisdiction and that its purported judgment was a nullity.

The People contend that section 1153 extended the definition of "Indian country" to cover Indian allotments for the first time in 1948 and that in order to vest exclusive jurisdiction in the United States (section 1151) such Indian allottees must have had an "unextinguished Indian title" to the land. By this, it is argued, is meant that the Indians holding under such an allotment must have had an "uninterrupted use and occupancy or to [sic] land which comprises a statutorily recognized Indian reservation." The crime occurred in 1950, and a complete answer to this argument is that the sections under consideration do not so provide. Nothing is to be found therein providing that Indian allotments must have once been part of an Indian reservation. The People contend that the sections were amended to cover Indian allotments after the decision in *United States* v. *Pelican*, 232 U.S. 442, 449 [34 S.Ct. 396, 58 L.Ed. 676], wherein it was held that land once part of an Indian reservation did not lose its character as Indian country by reason of a subsequent allotment to Indians. It was there held: "But, meanwhile, the lands remained Indian lands set apart for Indians under governmental care; and we are unable to find ground for the conclusion that they become other than Indian country through the distribution into separate holdings, the Government retaining control." It would appear that the Pelican decision adds nothing to the People's argument and serves merely to establish that the statute was amended so as to cover, specifically, Indian allotments. *Tooisgah* v. *United States,* 186 F.2d 93, relied upon by the People is not in point here. That case involved the murder of an Indian by an Indian in 1942. At that time section 1151 did not include Indian allotments within the definition of Indian country. The court there said: "But, judging federal jurisdiction here under the words of the statute when the offense was committed, we are now constrained to hold that when the reservation was dissolved and tribal government broken up, the allotted lands lost their character as lands 'within any Indian reservation'." The court there noted that it was not alleged that either Indian involved occupied the status of an allottee of lands the title to which was held in trust by the United States and that

federal jurisdiction was not involved or sought to be sustained under the provisions of the General Allotment Act.

It is next contended that the United States cannot claim exclusive jurisdiction over crimes committed by Indians in Indian country and that the case of *United States* v. *Kagama, supra*, 118 U.S. 375, with its wardship theory, is obsolete. From this it is argued that because Indians are now citizens of the United States and of the state in which they reside (U.S.C.A., tit. 8, § 1401 [formerly tit. 8, §§ 601, 604] ; *Anderson* v. *Mathews*, 174 Cal. 537 [163 P. 902] ; *Piper* v. *Big Pine School Dist.*, 193 Cal. 664 [226 P. 926]) they should be subject to the laws of the state in which they reside. It is said, with merit, that Congress itself has recognized the change in the condition of the California Indian in that it has expressly stated that California has jurisdiction over crimes by Indians in Indian country within the state. Public Law 280 was passed by the first session of the 83d Congress, 1953, giving to California jurisdiction in such situations. The fact remains, however, that at the time the crime in question was committed Congress had not seen fit to so act.

The last contention made by the People is that this state has concurrent jurisdiction with the United States. Since the statutes in question provide that the United States has exclusive jurisdiction in such a situation, the contention is obviously without merit.

Inasmuch as the superior court was without jurisdiction to try defendant for the crime with which he was charged, the judgment of conviction is a nullity and should therefore be reversed with directions to the trial court to dismiss the information against the defendant.

Appellant's petition for a rehearing was denied September 16, 1954. Carter, J., was of the opinion that the petition should be granted.